**Gregory G. ARMENTO, d/b/a Tradewind Marketing and Design, and formerly d/b/a Cumulus Creative Communications, Plaintiff,**

v.

**The LASER IMAGE, INC., and Douglas W. Sherry, Defendants.**

Civil No. 1:95CV102.

United States District Court, W.D. North Carolina, Asheville Division.

Oct. 16, 1996.

## MEMORANDUM OF OPINION

THORNBURG, District Judge.

**THIS MATTER** came before the Court on September 16, 1996, for non-jury trial based on a complaint filed May 1, 1995. The Defendants' answer was filed on February 26, 1996. Pursuant to Fed.R.Civ.P. 52, the Court renders its findings of fact and conclusions of law. For the reasons stated below, the Court finds in favor of the Defendants.

## I. JURISDICTION

This case is properly before the Court pursuant to 28 U.S.C. § 1338 which provides in pertinent part:

(a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trade-mark laws.

28 U.S.C. § 1338(a), (b).

The Plaintiff's state contract claims are properly within this Court's supplemental jurisdiction to hear state law claims that stem from the same controversy giving rise to the Plaintiff's federal claims. 28 U.S.C. § 1367(a).

## II. PROCEDURAL HISTORY

The Plaintiff, Gregory G. Armento, filed suit against the Defendants, The Laser Image, Inc., and Douglas W. Sherry, on May 1, 1995, alleging federal copyright and trademark infringement claims, state statutory unfair trade practice claims and common law contract claims. The Plaintiff has appeared before this Court *pro se.*

The Defendants filed their answer on February 26, 1996, with no counterclaims. The case was stayed from July 6, 1995, through January 23, 1996, pending resolution of an appeal in a companion case. *Armento v. City of Asheville,* Civil No. 1:94cv58.

On June 18, 1996, this Court denied the Plaintiff's motion to amend the complaint and request for jury trial. *See* Order, filed June 18, 1996. During trial, the Defendants were granted permission to file a supplemental trial brief on September 16, 1996. The Plaintiff filed a Post–Trial Brief on September 20, 1996.

## III. FINDINGS OF FACT

In June 1987, Defendant Sherry founded The Laser Image, a graphic design and typeset business, in Asheville, North Carolina. Sherry, formerly a school teacher, had recently moved from Vermont. That summer, Sherry met the Plaintiff, Gregory G. Armento, an illustrator in Asheville. Sherry contacted the Plaintiff soon thereafter to seek his services for the illustration of a map of Asheville.

Defendant Sherry had brought from Vermont an illustrated map of Stowe, Vermont, titled the "Best of Stowe," which he planned to use as a model for the planned illustrated Asheville map. Defendant's Exhibit B1. The Defendant showed the map to the Plaintiff and told him that he had a similar "folksy" map in mind for Asheville. Advertising marquees were to be placed around the map border and the advertisers' locations "called out" on the map.

On August 18, 1987, the Defendant, acting for his business The Laser Image, and the Plaintiff, doing business as Cumulus Creative Communications, signed a contract "for the purpose of the production of two illustrated maps and the design of advertisements for the map brochure." Defendants' Exhibit 10. The contract was signed by both parties and neither contests its validity. No legal counsel helped the parties frame the contract.

The contract calls for Armento to design and produce camera-ready art consisting of: an illustrated map of downtown Asheville (the main illustrated map), an illustrated map of the greater Asheville area (to appear on the back of the brochure), and an illustrated cover for the brochure. The contract also calls for the Plaintiff to design advertisements, which the Defendants would typeset; however, the advertisements were to be designed only if The Laser Image was able to complete marketing of the map.

Armento was to be paid under the contract in the following manner. For his design and illustration work associated with the maps and cover, the Plaintiff would receive $1,190, plus reimbursement for supplies. For advertisement design, Armento would receive $10 for each design and $4 for each mechanical drawing. Two other payment provisions were included as well. First, if for any reason The Laser Image was unable to complete the marketing of the map, it agreed to pay the Plaintiff for all work completed, up to a maximum of $200, excluding deposit. Second, if the map brochure were reprinted in the future, The Laser Image agreed to pay Armento a total of $360 for revisions of the map and cover illustrations. The agreement was stated to be in effect for four subsequent reprints.

The August 18, 1987, contract declared that the "illustrated maps and advertising artwork produced by Cumulus for The Laser Image remain the sole property of The Laser Image, and cannot be reproduced or used for any other purpose by Cumulus without the written consent of The Laser Image." *Id.* Both parties signed the contract, and in this lawsuit all parties agreed that the signatories had performed their duties under the August 18, 1987, agreement.

By August 18, 1987, the parties had been working together for at least one month, indicated by the contract language stating that a $200 deposit for illustration work had been paid to Armento on July 15, 1987. Also by August 18, 1987, the Plaintiff was, by his own admission, an experienced professional artist familiar with the fundamentals of copyright law.

Later in 1987, the first Illustrated Map of Asheville was produced, printed and distributed. Sherry helped edit the map illustration's content, layout and accuracy. He contacted advertisers and arranged to have their marquees and locations included in the Map and was responsible for printing and distributing the Map.

Because Sherry had a laser writer and Armento did not, the Defendant did the typesetting. In so doing, Sherry caused two notices to be printed on the main illustrated map of downtown. The bottom right-hand corner contained three lines of small text: © "Copyright 1987 Published by The Laser Image, Asheville, NC 704–298–3719." The opposite bottom left hand corner contained one line of small text: "Illustration by Gregory Armento."

The 1988 and 1989 editions of the Illustrated Map of Asheville were produced under the 1987 contract. Armento completed new cover illustrations for the brochure (hand drawn renderings of prominent Asheville facades), and was paid $360 for each update. Sometime in late 1989 or early 1990 the parties discussed producing the map illustrations on computer.

On July 10, 1990, the parties signed a new contract. Defendants' Exhibit 11. Both parties agree that the contract is valid and that it served to replace the 1987 contract. The evidence showed that both parties performed their express contractual duties up until the contract was disavowed, in late 1993 or early 1994. Both parties signed the agreement, which was not prepared with aid of counsel.

The July 10, 1990, contract differed in some respects from its 1987 predecessor (although on the whole the documents are substantially similar). The Laser Image, by July 1990, was incorporated in North Carolina and Armento was now doing business as Tradewind Marketing and Design. In the contract, the Plaintiff agreed to design and produce computer-generated art consisting of: an illustrated map of downtown Asheville and an illustrated map of the greater Asheville area, as well as an illustrated cover for the map brochure. In addition, Armento agreed to furnish The Laser Image with "the" computer files of the two maps in formats to be later specified by the Defendants. *Id.*

In return for his illustration/design services Armento was to be paid $3,000. The Plaintiff did not contest that he was so paid. The contract also called for The Laser Image to pay Armento a total of $450 for each additional Illustrated Map of Asheville edition in which the computer designed maps were used. The evidence showed that The Laser Image has paid $450 to Armento for the years 1990, 1991, 1992 and 1993. The $450 payments were installments for the work done by Armento on the original design in 1990. Armento risked not being paid the total value of that work if future Illustrated Map printings did not occur, but stood to gain a profit if the annual payments ended up

exceeding the value of his original work (minus the $3,000 he had already been paid).

The contract recites that it was entered into for "the purpose of the production of two illustrated maps and cover design for the Illustrated Map of Asheville." *Id.* The ownership provisions of the contract remained the same with one minor exception. The parties again agreed that the "illustrated maps and artwork produced by Tradewind for The Laser Image, Inc., remain the sole property of The Laser Image, and cannot be reproduced or used for any other purpose by Tradewind without the written consent of The Laser Image, Inc." *Id.* An exception was added so Armento could try to sell the artwork to the company that manufactured the software he used in designing the map. In that case, The Laser Image had to be notified that Armento had agreed for the software company to use the designs.

Armento created a new map drawing, took it to a blueprint shop and had it digitally scanned, then modified that file to create a new template for the downtown illustrated map. He delivered the resultant computer file to the Defendants, but the file could not be transferred to the equipment used by The Laser Image due to a compatibility problem with Armento's software. The parties agreed that Armento would transfer the disk copy once the software company fixed the compatibility problem in the program's next edition. For the 1990 edition of the Illustrated Map, Armento delivered a copy-ready version of the illustration with advertising marquees already added. The Laser Image arranged the printing and distribution of the Map.

The 1991 Illustrated Map of Asheville was substantially the same as the 1990 edition, save for updates of advertisers and the cover. The Laser Image paid Armento more for the cover artwork than called for under the 1990 contract because the illustration took more time than either party had expected. Defendants' Exhibit 12, Invoice 1155.

In 1991 the Asheville Downtown Development Office ("ADDO") contacted Sherry about using the illustrated map of downtown in an expanded form. Sherry contacted Armento to get a cost estimate. On April 24,

1991, Armento quoted him a $1,200 price, payable in two installments of $600. Defendants' Exhibit 12, Invoice 1153. Sherry quoted the ADDO a price of $600, or half the amount Armento indicated he would be invoicing The Laser Image for the work. The Laser Image paid the first installment of $600 to the Plaintiff on April 28, 1991. Defendants' Exhibit 12, Invoice 1155.

Sherry agreed to pay more for the artwork than he would receive from ADDO because he wanted to expand the geographical reach of the Illustrated Map of Asheville brochure to include more advertisers. The parties did not execute a separate written contract for expanding the downtown map illustration. The Plaintiff, in his price quote for the expansion, characterized the job as for "additional illustration on the Downtown Map for the Downtown Development Association." Defendants' Exhibit 12, Invoice 1153.

The map artwork produced in 1991 in return for The Laser Image's payment of $1,200 was an addition to the 1990 map and was not a separate, new piece of artwork. The Laser Image paid the second and final installment of $600 by check dated March 26, 1992. Plaintiff's Attached Exhibit B3, check no. 4376.

· Plaintiff delivered the expanded downtown map illustration to The Laser Image sometime before June 12, 1992. Sherry passed the artwork on to ADDO and wrote a letter clarifying that his "intent that The Laser Image, Inc. will retain copyright control of this map." Exhibit 5, Letter from Sherry to Leslie Anderson, June 12, 1992, *attached to* the Complaint. Leslie Anderson, representing ADDO, signed the letter "OK." *Id.* ADDO paid The Laser Image the $600 it owed on July 6, 1992. Plaintiff's Exhibit C1.

Also in 1992, Armento integrated advertising into the new map and gave the resultant artwork to Sherry and The Laser Image for use as the 1992 Illustrated Map of Asheville. Armento was paid $450 and additional sums for producing the cover illustration and map artwork for the 1992 Illustrated Map of Asheville, per the 1990 contract. Plaintiff's Exhibit A3.

In October 1992, Plaintiff contracted separately with ADDO and the Asheville Downtown Association ("ADA") to produce marketing products for the "Light Up Your Holidays" Festival scheduled for December 11, 1992.

As part of that project, the Plaintiff contacted Sherry about the possibility of using the downtown map artwork. The ADDO contacted Sherry as well to ask permission to use the map image. Sherry gave his oral approval and ADDO delivered the 1992 downtown map artwork to Armento for use in the project. Plaintiff's Affidavit, at 3. The map produced by the Plaintiff for the ADA's "Light Up Your Holidays" festival included the following text at the bottom: "Design & Illustration: Gregory G. Armento. Map Reprinted With Permission From: The Laser Image." Defendants' Exhibit 14.

The map was produced with new cover artwork and printed and distributed in the same manner as the previous editions. Plaintiff invoiced the Defendants for the 1993 Illustrated Map of Asheville in July 1993.

On July 13, 1993 Sherry wrote a letter to the *Asheville Citizen–Times* regarding the paper's potential use of the downtown map artwork. Plaintiff's Exhibit 5, July 13, 1993 letter From Sherry to Mike Manning. Sherry stated that he would be willing to provide the paper with a copy of the illustration under several conditions, one being that credit "of the illustrator, Gregory G. Armento and ownership, The Laser Image, Inc., must be given." *Id.*

In late July 1993 Plaintiff and Defendants were dismayed to discover several apparently unauthorized versions of the Illustrated Map of Asheville and its associated dressings and artwork published throughout Asheville in connection with the 1993 Bele Chere Festival. The offending materials included a magazine-like insert in the July 18, 1993, *Asheville Citizen–Times,* Plaintiff's Exhibits D1, D4; a Pocket-size guide to the Festival, Plaintiff's Exhibit C3; and graphics appearing in the Friday, July 23, 1993, and Saturday July 24, 1993, editions of the *Asheville Citizen–Times,* Plaintiff's Exhibits D2, D3.

On July 26, 1993, following publication of the map artwork in these various forms without copyright notices affixed, the Plaintiff wrote a letter to Sherry laying claim to the copyright for the 1992 downtown map artwork. Plaintiff's Exhibit A5.[1]

On July 30, 1993, Sherry sent a letter to Nate Tibbits, the ADDO representative with whom he had been in contact concerning the upcoming Bele Chere Festival, questioning ADDO's use of the Illustrated Map of Asheville without the approval of or copyright credit to The Laser Image. See Complaint Exhibit 5, July 30 Letter from Sherry to Nate Tibbits. In the letter, Sherry stated: "My company has spent a lot of time and money creating this illustration and it is important to me that we maintain control over how the map is used and reproduced." *Id.*

On August 23, 1993, the Plaintiff wrote a letter to ADDO requesting that all copies of the Official Street Guide and the Bele Chere Guide be recalled. Plaintiff's Exhibit A6.

On October 23, 1993, Sherry wrote a letter to the *Asheville Citizen–Times* requesting the paper take several measures in response to its July map publications. Plaintiff's Exhibit 5, October 23 letter from Sherry to Jay Banks. Sherry observed that the paper had printed the items without giving "proper credit to my company or to my illustrator, Gregory G. Armento," and that "problems [could] be caused as the result of the map being printed without my copyright." *Id.* One remedial action Sherry suggested was the printing of a correction stating "that the copyright of the map used for Bele Chere belongs to The Laser Image, Inc., and that the illustrator is Gregory G. Armento." *Id.*

Sometime in late summer 1993, Armento contacted the Copyright Office to apply for a Certification of Registration for the Illustrated Map of Asheville. Armento received Copyright Certification effective September 3, 1993. Plaintiff's Exhibit 2.

In the fall of 1993, Sherry, concerned about Armento's claim to copyright, contacted legal counsel. The offices of Cory Flint, P.A., acted as his agent in applying for a Copyright Certification of Registration for the Illustrated Map of Asheville in late 1993. That Certification was made effective January 18, 1994. Defendants' Exhibit 9.

In January 1994, the Defendants' reached agreement with the *Asheville Citizen–Times* regarding the paper's printing of map artwork in July 1993. See Plaintiff's Exhibits D5, D6. The correction language to which they agreed read, "The map published in the 1993 Bele Chere guide and which appeared in the July 24, 1993, edition of the *Asheville Citizen–Times* is copyrighted by The Laser Image. The illustrator of that map was Gregory Armento." Plaintiff's Exhibit D6.

On March 8, 1994, the Plaintiff wrote to Sherry informing him he considered their professional relationship with regard to the Illustrated Map of Asheville severed as of January 10, 1994. Plaintiff's Exhibit 5, March 8, 1994 letter from Armento to Sherry.

## IV. CONCLUSIONS OF LAW

The Court concludes as a matter of law that the facts presented throughout this trial do not entitle the Plaintiff to relief on any of the several claims he has levelled against the Defendants. The Plaintiff alleged that the Defendants: infringed his federally-protected copyrights, giving rise to a Copyright Act claim, 17 U.S.C. § 501, and two state law contract claims; engaged in unfair or deceptive trade practices in violation of N.C.Gen. Stat. § 75–1.1; and infringed his federally protected trademark and trade dress rights in violation of the Lanham Act. See 15 U.S.C. § 1125.

All of these claims are incomplete for the reasons more fully set out below. In sum-

1. "I know this may be a source of distress for you and may be even some feeling of betrayal [sic]; I regret having to take this posture, but my purpose for such a claim is honorable. I am willing to negotiate a new contract for the latest map illustration and offer *very* favorable terms to The Laser Image based on their past performance and respect for artistic creations. *Private-*

*ly, I must admit to you, that your patronage in the past has often been the difference between eating and not eating for me, and you personally have been a role-model of integrity. You still have my personal respect and loyalty."* Plaintiff's Exhibit A5, July 26, 1993 letter from Armento to Sherry (italics added) (emphasis in original).

mary: Plaintiff does not own the copyrights that he alleges Defendants infringed; he owns no copyrights eligible for protection under common contract or agency law; he has failed to show that the Defendants acted in any unfair or deceptive manner under applicable state law; and, finally, he does not own the trademark or trade dress he alleges Defendants infringed.

At the outset, it should be noted that the Plaintiff's claims address and involve two separate but related printed products, the Illustrated Map of Asheville and map artwork which is used within the Illustrated Map. Armento's trademark and trade dress claims concern the "Illustrated Map of Asheville." His copyright claim centers on the "map artwork" for which the Plaintiff and Defendant possess Certificates of Copyright Registration from the U.S. Copyright Office. His contractual claims (nonperformance and illegal contract) also concern his copyright to the "map artwork." The Plaintiff's unfair and deceptive trade practice claims involve both the Illustrated Map and the underlying map artwork. See Plaintiff's Pretrial Memorandum at 9–10.

## A. COPYRIGHT OWNERSHIP

At the core of his Copyright Act claim, the Plaintiff alleges that the Defendants infringed his copyright to the downtown map artwork which serves as the graphic basis for the Illustrated Map of Asheville. The Laser Image and Sherry offer a complete defense, contending that they, not Armento, own copyright to the commissioned map artwork.

Armento's claim specifically concerns a computerized version of the downtown map artwork, which he produced in 1992 for the ADDO as part of an arrangement brokered by Sherry. Armento contends first that this map was not subject to the ownership provisions of the 1990 contract, and second, even if it were, the contract terms do not alter the fact that the Plaintiff owns (and the Defendants infringed) copyright in the map artwork.

■ As to the Plaintiff's initial claim, the Court concludes that the 1992 map artwork is subject to the commissioned-work owner-ship provisions of the 1990 contract signed by the parties. The Plaintiff argued that the 1992 map artwork was "new" and distinct from the previous map artwork he was commissioned to do for the Defendants, but the facts indicate that the 1992 map artwork was merely an expansion of map artwork originally commissioned under the 1990 contract and (as explained *infra.*) owned by the Defendants. According to the Plaintiff, Sherry acted as his agent in getting a third party to commission the 1992 artwork, and indeed the ADDO did pay for a version of that map. However, rather than acting like an agent, Sherry paid Armento $600 of his *own money* (ADDO paid Sherry $600; Sherry paid Armento $1,200 for the total job) to expand the map artwork so the Illustrated Map could reach a broader advertising base. In fact, for his part, the Plaintiff seems to have understood he was expanding an existing map rather than creating a new one, for he described the work in his price quote as "additional illustration on the Downtown Map for the Downtown Development Association." Defendant's Exhibit 12, Invoice 1153. And, the 1993 Illustrated Map of Asheville did in fact incorporate the expanded map that Sherry had paid Armento to produce. See Defendants' Exhibit 6.

The Plaintiff, in sum, made small modifications to a larger map that Sherry had commissioned under the 1990 contract. The facts available indicate that both the Defendant and Plaintiff understood the work to be an extension, instead of "a new illustration that has no existing contract [and is] therefore under [the Plaintiff's] copyright and ownership." Plaintiff's Exhibit A5. This Court concludes that the slightly modified map artwork, like the map on which it was based, was subject to the ownership provisions of the 1990 contract.

■ Armento asserts that even if the 1990 contract applies to the map artwork, it does not alter the fact that he owned the map artwork copyright and that the Defendants infringed it. To make out his copyright infringement claim, Armento must prove both that he is the owner of a valid copyright to a

work under the Copyright Act [2] and that the Defendants copied original constituent ele-

2. The Court is unpersuaded that the Plaintiff's Certificate of Registration for the Illustrated Map of Asheville from the U.S. Copyright Office, effective September 3, 1993, helps establish his claim of copyright to the underlying artwork. The Plaintiff does indeed appear to have a valid Certification of Registration for the Illustrated Map of Asheville, and such Certifications by statute are prima facie evidence of copyright ownership and validity, creating a presumption of copyright that the Defendants must rebut. 17 U.S.C. § 410(c); *M. Kramer Mfg. Co., Inc. v. Andrews,* 783 F.2d 421, 434 (4th Cir.1986). That presumption, however, "merely orders the burden of proof" in a copyright action—by possessing a Certificate, the Plaintiff shifts the burden of production to the Defense. See 17 U.S.C. § 410(c), 1976 Acts, Revision Notes of Committee on the Judiciary, House Report No. 94–1476; *Rogers v. Koons,* 960 F.2d 301 (2d Cir.1992), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Superior Form Builders v. Dan Chase Taxidermy Supply Co., Inc.,* 851 F.Supp. 222 (E.D.Va.1994), *aff'd,* 74 F.3d 488 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 53, 136 L.Ed.2d 16 (1996).

Here, not only have the Defendants rebutted Armento's Copyright Certificate with two sound theories of actual ownership, they have presented their own Certification of Registration for the Illustrated Map of Asheville, dated January 18, 1994. See Defendants' Exhibit 9. The Plaintiff pointed out several errors in the Defendants' Certification which would presumably undermine its validity.

In particular, when asked on their application if the *Plaintiff's* contribution was a "work for hire," the Defendants checked "No" instead of "Yes." The Plaintiff rightly noted that this answer is totally at odds with the Defendants' trial argument that the Plaintiff's contributions were "work for hire" under the Copyright Act. However, the Defendants' Certificate also indicates that The Laser Image's contribution *was* "work for hire," a state of affairs that neither party alleged and, given that Laser did all the hiring in the case, neither ever would. It seems clear, in sum, that the person filling out the Defendants' Certificate lacked a firm grasp on the concept of "work for hire" under the Copyright Law. As sloppy as that box-ticking was, the Defendants' mistakes on its application do not sink to the kind of intentional misrepresentation that might justify denying the validity of the Certificate as a whole. See *Johnson v. Automotive Ventures, Inc.,* 890 F.Supp. 507, 510 (W.D.Va.1995); *Lida, Inc. v. Texollini, Inc.,* 768 F.Supp. 439, 442 (S.D.N.Y. 1991).

Thus the Court is presented with two conflicting Certificates, one no less valid-seeming than the other. The Plaintiff argues that the Certificates address different subject matter, and thus are not competing at all. But closer examination reveals that the two Certificates address the very same subject matter here in dispute.

Both Certificates, in the space for the title to the copyrighted work, have been filled in "Illustrated Map of Asheville." See Plaintiff's Complaint Exhibit 2; Defendants' Exhibit 9. More to the point, the Defendants' Certificate stakes explicit claim to all of the artwork comprising the Illustrated Map. It lists the Plaintiff as the author of the map, then declares that "ownership rights of Gregory G. Armento have been transferred by written agreement." Defendant's Exhibit 9. On the back, an "earlier version" of the "illustrated map brochure" is specified as a preexisting work that the Registered Illustrated Map incorporates, and the material additions to which copyright is claimed include "New map drawing, new cover artwork, new advertising artowrk [sic], and new compilation of advertisements and artwork." *Id.* The Defendants laid claim to all they could, including Armento's artwork.

Even the Plaintiff's own application indicates that these Certificates claim copyright to the same subject matter: the "map" he seeks to register is not specified as a contribution to a collective work but rather titled simply as the Illustrated Map of Asheville, a derivative based on an earlier version, the "1991 Illustrated Map of Asheville." See Plaintiff's Complaint Exhibit 2. Given the energy spent by Plaintiff distinguishing his "map artwork" from the "published brochure" that "incorporates" it, see, e.g., Plaintiff's Post–Trial Brief at 1, his failure to distinguish the two on this application adds further support to the conclusion that parties do indeed make mistakes on their Copyright Certifications of Registration. Perhaps this is why courts often excuse errors and omissions in Certificate applications where no bad faith is involved, and why in copyright actions Certificates are afforded only the weight of a rebuttable presumption. See e.g., *Whimsicality, Inc., v. Rubie's Costume Co., Inc.,* 891 F.2d 452 (2d Cir.1989); *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081 (9th Cir.1989); *Eckes v. Card Prices Update,* 736 F.2d 859 (2d Cir.1984); *Ganz Bros. Toys v. Midwest Importers of Cannon Falls, Inc.,* 834 F.Supp. 896 (E.D.Va. 1993).

In the end, the Court is left to consider two Copyright Certificates of Registration addressing the same controverted property, the computerized downtown map artwork that Armento created pursuant to the 1990 contract. The fact of competing Certificates alone might serve to shift the burden of production to the Plaintiff; and had the Defendants' not presented two valid theories of actual copyright ownership, this Court may have decided the case on that ground. It need not, however, because the Defendants have demonstrated that the Plaintiff's Certificate lays claim to a copyright that Armento already had signed away.

ments of that work. *Feist Publications, Inc. vs. Rural Telephone Service Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1295–96, 113 L.Ed.2d 358 (1991); *Towler v. Sayles,* 76 F.3d 579, 581 (4th Cir.1996). The Laser Image and Sherry offer a complete defense in asserting that they, not Armento, own copyright in the map artwork.

■ The Defendants presents three alternative theories of copyright ownership. They contend first that The Laser Image owns the map illustrations as works it commissioned "for hire" under Copyright Act sections 101(2) and 201(b). Second, The Laser Image contends it owns copyright to all commissioned map illustrations because the Plaintiff transferred that copyright to them in a contract meeting the formal requirements of section 201(d) of the Act. Third, the Defendants claim they have an undivided right to reproduce the map artwork as joint author of the Illustrated Map of Asheville. This Court concludes that the first two theories—that Plaintiff's art was "work for hire" and that he transferred copyright to the Defendants in writing—vest copyright ownership in the Defendants and foreclose the Plaintiff's infringement claim.[3]

## 1. The Contested Map Is a Commissioned "Work For Hire"

If Armento's map artwork qualifies as "work for hire" under section 101(2) of the Copyright Act, and the parties executed no signed agreement vesting copyright ownership in him, then the work became the copyright property *ab initio* of the Laser Image, the entity which commissioned the work. 17 U.S.C. § 201(b). To show that the map illustrations were works made "for-hire" (and thus the property of The Laser Image), the Defendants must show that the creator was either an employee acting within the scope of his employment or an independent contractor commissioned to create a "work for hire." 17 U.S.C. § 101(1), (2) (defining "work made for hire"). An independent contractor's work will be classified as "for hire" only if: (1) he was specially commissioned to create the work in question, (2) the created work falls within one of nine statutorily defined categories, and (3) the parties expressly agreed in a written instrument signed by them that the work would be a work made for hire. 17 U.S.C. § 101(2).

■ The first duty of any court in determining whether a work is made "for hire" under the Act is to use the "principles of general common law of agency" to determine whether the map artwork was prepared by an independent contractor or an employee. *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989). Those principles and the factors laid out by the Supreme Court in *Reid* indicate that Armento was an independent contractor and not an "employee," a fact essentially admitted by Sherry in his testimony and implicitly recognized in the Defendants' supplemental brief and summation. The Plaintiff's work, illustrating the city of Asheville in an accurate, attractive and, in Sherry's words, "folksy" manner, required the kind of considerable skill that suggests an independent contractor. Moreover Armento did his work outside The La-

---

**3.** The Court will not address the Defendants' "joint author" argument given the alternative basis for its decision, but notes that the evidence at trial did not indicate that the two men jointly authored the map artwork. The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Case law has focused on "the requisite intent on the part of both participants that their contributions be merged into a unitary whole...." *Childress v. Taylor,* 945 F.2d 500, 505 (2d Cir.1991).

While Sherry's input on the map illustration—through layout and content edits, and his vision to create the Illustrated Map—might amount to a separately copyrightable contribution (and thus be a contribution to a "joint work" in some federal circuits, *see Andrien v. So. Ocean County Chamber of Commerce,* 927 F.2d 132 (3d Cir. 1991) (granting copyright to plaintiff who authorized and oversaw embodiment of real estate map compilation in such detail as to make map artist his "amanuensis")), it is clear that he and Armento lacked the intent to make him a "joint author" of the map artwork. Armento has consistently claimed himself as the sole originator of the map artwork and Sherry gave him due credit by allowing the phrase "Illustrated by Gregory Armento" to appear on the maps. Armento's intent to remain sole author of the map artwork would alone be enough to stop Sherry's joint authorship claim. *Childress,* 945 F.2d at 509.

ser Image's offices and apparently worked on this project only once per year. Unlike an employee, he had complete control over when and how long to work, and The Laser Image had no right to assign him additional projects. Finally, The Laser Image did not put Armento on its payroll, withheld no related taxes and provided him with no employee benefits. Under *Reid,* these factors indicate that the Armento was an independent contractor. *Id.,* at 751–52, 109 S.Ct. at 2178–79.

■ Thus, to qualify Armento's artwork as "work for hire" (to which Defendants hold copyright), the Defendants must make three additional showings: that the work fell within a statutorily specified category, that the work was specially commissioned, and that the parties expressly agreed in a signed, written agreement that the work would be "for hire." 17 U.S.C. § 101(2); *Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410 (7th Cir.1992). The nine specified categories of intellectual property include commissioned contributions to a "collective work," 17 U.S.C. § 101(2), and it is under this category that Armento's work qualifies, as a commissioned contribution to the collective work the Illustrated Map of Asheville. The Plaintiff did not contest that the 1987–1993 Illustrated Maps of Asheville are collective works as defined in section 101(2) of the Act, or that those collective works contained his commissioned map artwork. See Plaintiff's Post–Trial Brief, at 6.[4] The Defendants have satisfied the second element as well,

demonstrating the work was specially commissioned by the Laser Image. 17 U.S.C. § 101(2). Armento's work was specially commissioned under two separate contracts directing him to design and produce camera-ready illustrated maps of downtown and greater Asheville as well as an illustrated cover for the map brochure (the collective work) in return for specified sums. See Defendants' Exhibits 10, 11.

Having passed those first two hurdles, the Defendants reach the third: they must show that parties did "expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101(2). The Laser Image claims that both the August 18, 1987, and July 10, 1990, contracts contain language meeting this "express agreement" requirement. The relevant contract language reads as follows:

> The illustrated maps and advertising artwork produced by [Armento] for The Laser Image remain the sole property of The Laser Image, and cannot be reproduced or used for any other purpose by [Armento] without the written consent of The Laser Image.

See Defendants' Exhibits 10, 11.[5]

While the contracts were signed by both parties and the language demonstrates that the parties expressly intended to treat the work as if The Laser Image owned it (as the company would under the work-for-hire doc-

---

4. In this connection, it deserves mentioning that the Plaintiff has claimed that the copyright notice on the Illustrated Maps (which to the lay reader appears to indicate copyright ownership in The Laser Image) was a "collective work" notice. As provided in the Act, a collective copyright notice is a single notice applicable to the collective work that can invoke the evidentiary weight of copyright notice for the individual contributions it contains, regardless of the ownership of copyright in the contributions and whether or not they have been previously published. 17 U.S.C. § 404(a). Because the Defendants owned the copyright both to the collective work and Armento's individual contributions to it, the Court mentions the copyright notice only insofar as it further supports the conclusion that Plaintiff's work was a contribution to a "collective work" within section 101(2) of the Act (qualifying it for the work for hire doctrine).

   This Court agrees that the map artwork was commissioned as a contribution to a collective

work rather than as a "supplementary work," a classification suggested by the Defendants. See Defendants' Supplemental Trial Brief, at 2 (citing the word "maps," which appears within the supplementary work definition).

5. The language used is from the 1987 contract. The 1990 contract is substantially the same, though a caveat was added for Armento: "The only exception to this [The Laser Image's control over reproduction of the map artwork] is if [Armento] authorizes use of the computer designs by a software publisher. It is understood that [Armento] may be paid for this use. The Laser Image, Inc. must be notified of this authorization." Defendant's Exhibit 11. The evidence adduced at trial indicated this exception was included because Armento was trying to sell his artwork to the maker of the software he used to draw the 1990 map.

trine), neither contract included the phrase "work made for hire." This Court concludes that, for the purposes of qualifying the work under the for-hire doctrine, that omission is not fatal. The parties expressly contracted for a "work for hire" arrangement, and because they did, copyright to the map artwork produced under those contracts belongs to The Laser Image, Inc.[6]

The Act's "work for hire" express writing requirement has been recognized as having two functions; both are served by the contract language here. The writing requirement serves first as a statute of frauds so that written agreements, rather than oral ones, will govern the distribution of copyrights in the "for-hire" context. *Schiller,* 969 F.2d at 412. The valid contracts, signed by both parties, manifestly satisfy this "writing" requirement. The only real question is whether they satisfy the second function: to make the "ownership of the property rights in intellectual property clear and definite, so that such property will be readily marketable." *Id.,* at 412. This, essentially, is a test of whether the writing is "express" enough— that it specifies the work is being commissioned and produced in a "for hire" manner so that the parties are on notice that the commissioning party owns copyright to the work produced. As the Seventh Circuit has explained, the law provides that:

> The creator of the property is the owner, unless ... the parties have agreed in a writing signed by both that the person who commissioned the creation of the property is the owner. The writing must precede the creation of the property in order to serve its purpose of identifying the (non-creator) owner unequivocally.

*Id.,* at 413.

In *Schiller,* the Seventh Circuit was considering the effect of a written assignment of copyright signed only by one party (the creator) *after* the contested works had been created. *Id.* The court determined that because both parties had not signed the document and because the document was executed after creation of the work, it was doomed for section 101(2) purposes. However, the analysis laid out by Judge Posner and the dearth of analysis supporting the alternative view (that the writing need contain the language "work-for-hire"),[7] suggests that the contractual writing in the present case, executed before creation of the contested property and signed by both parties, is sufficiently "express" in its assignment of rights to Sherry so as to make the work created under it "for hire."

The contractual provision making Sherry the "sole owner" of the created work specified "that the person who commissioned the creation of the property is the owner." *Schiller,* 969 F.2d at 413. The issue this Court faces is whether that disposition of rights should be ignored because the contract language omits the words "work for hire." The Second Circuit has indicated that the omission is fatal. *See Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 560 (2d Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995). At issue in *Playboy* was copyright to hundreds of paintings drawn by an artist over many years for the magazine, initially at *Playboy's* special request but later on approval. *Playboy* claimed it commissioned the works "for hire," and presented three check legends (stamps on the back of payment checks for the paintings) to satisfy the writing requirement of § 101(2). The Second Circuit found that the series of checks with a legend "assigning" all copyright in the paid-for art to *Playboy* did not

---

6. Copyright of "for hire" work rests in the commissioning party minus any written agreement to contrary. See 17 U.S.C. § 201(b).

7. *Compare Playboy Enterprises, Inc., v. Dumas,* 53 F.3d 549, 560 (2d Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995) (finding a written "assignment ... of all right, title and interest" on back of check cashed for disputed property insufficient for failing to "mention a work for hire relationship," while upholding writings containing additional clauses such

as "payee acknowledges payment in full for services rendered on a work-made-for-hire basis" and "[legend agreement] contains the entire understanding of the parties and may not be changed except by a writing signed by both parties") *with United States Media Corp. v. Edde Entertainment et al,* 1996 WL 520901 (S.D.N.Y. Sept. 12, 1996) (memorandum and order) (finding that because a company "commissioned" certain work it retained ownership of the material produced).

suffice because "it does not mention a work-for-hire relationship." *Playboy*, 53 F.3d at 560. Two other series of checks, stamped with legends explicitly acknowledging "services rendered on a work-for-hire basis," were found sufficient because they contained language "confirming that services were rendered ... on a work-for-hire basis." *Id.* The decision does not articulate why the words "work for hire" need be included to satisfy the § 101(2) writing requirement but instead simply cites to the statute. The statute, however, does not demand such a parsimonious reading. Moreover, as the present case indicates, rotely invalidating the ownership effect of work for hire contract because it fails to include the words "for hire" leads to unjust results and undermines the purposes of the Copyright Act.[8]

This Court, viewing facts of this case as well as the case law and history of the Copyright Act, finds reason to conclude that Armento's work was indeed "considered" by the parties to be "for hire." As the U.S. Supreme Court has recognized, the independent contractor portion of the "for hire" provision was included in the Act as part of a legislative compromise between interest groups representing publishers and authors. *Community for Non–Violence*, 490 U.S. at 746, 109 S.Ct. at 2175–76. Against a background of commissioned works that could not be considered "work for hire" in any circumstance, several categories of intellectual property (including contributions to collective works) were set out as exceptions. *Id.* Explained the Court:

> The interested parties selected these categories because they concluded that these commissioned works, although not prepared by employees and thus not covered by the first subsection, nevertheless should be treated as works for hire because they were ordinarily prepared at the instance, direction, and risk of a publisher or producer.

*Id.* (citations omitted). In other words, the independent contractor "for-hire" provision was included at the instance of the publishing interests as an exception to the general ban (a concession for authorial interests) on contracted for-hire arrangements. *See generally, Dumas v. Gommerman*, 865 F.2d 1093, 1101 (9th Cir.1989) (discussing legislative history). As the Fifth Circuit recognized prior to its *Playboy* decision, "the activities in § 101(2) look like the kind of activities where the buyer normally wants and needs to be a statutory author to gain complete ownership of a collaborative project." *Easter Seal Soc. v. Playboy Enterprises*, 815 F.2d 323, 331 (5th Cir.1987), *cert. denied*, 485 U.S. 981, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988).

The legislative history of the for-hire compromise as understood by the courts indicates that the facts here comprise the very kind of arrangement that the statute seeks to define as work created for hire. Sherry wanted and needed to gain complete ownership of this collaborative project. The work was his idea and was prepared at his in-

---

8. As the Plaintiff points out, The Laser Image was, in later years, capable of including the words "for hire" in the contract it drew up for Armento's replacement illustrator: "The work commissioned is specifically commissioned for use as a contribution to a collective work and being so [sic], the parties agree that the commissioned work is to be considered a work-made-for-hire pursuant to 17 U.S.C. § 101. This means that [the] company shall own all rights to any work developed, including all copyrights and the right to market (or not to market) the work." Plaintiff's Exhibit B12. But this latter language was included only after Sherry and Armento came to loggerheads about the map artwork copyright and Sherry had contacted counsel. By contrast, the first two contracts were prepared by the parties, and the evidence did not demonstrate that these documents failed to express the substantial intent of the parties. More to the point, it seems plain that Sherry did not omit the words "for hire" to lull Armento into mistakenly signing away his rights, for the agreements explicitly *state* that The Laser Image shall own the created work and the right to use and distribute it. The *Playboy* decision indicates that this would be insufficient because the statute says so. But the statute calls for the parties to expressly agree that the "work shall be considered a work made for hire," not that the "work shall be considered and labelled a 'work made for hire.'" As explained *supra*, the term "work made for hire" is at base more than a label; it is a copyright demarcation. Where the parties have demarcated copyright in the commissioning contract so that ownership is vested in the commissioning party, the Fifth Circuit offered no rationale as to why, under the Act, the parties had not in fact "considered" the commissioned work to be a work made for hire.

stance, direction, expense, and risk.[9] He set out his intent to own the commissioned work in the contract and acted at all times consistently with that relationship. In other words, considering the contracts and the dealings of the parties through the years, the map artwork in question, a specially commissioned contribution to the Illustrated Map collective work, is that type of creation that publishing interests sought to classify, and which the Act does classify, as being owned by the commissioning party.

Deciding not to reify the phrase "for hire" leads to no consequences that might militate against classifying this artwork as such under the Act. Indeed, ignoring the import of the commissioning contracts because they fail to include the phrase "work for hire" would undermine "Congress's paramount goal ... of enhancing predictability and certainty of copyright ownership," *Community for Creative Non–Violence,* 490 U.S. at 749, 109 S.Ct. at 2177, because putting such a premium on the phrase would lead to *more* unpredictability. For example, an artist who signed a contract that included the words "work for hire" but also included terms giving her all rights including the right to sole possession, license fees and copyright in the created work would later find those rights (which she bargained for) prostrated by the innocuous-seeming words "for hire." Likewise, a publisher unfamiliar with the law who contracted with an artist and paid consideration for copyright in the commissioned work, might later find the benefit of his bargain undercut because the agreement failed to include the words "work for hire."

This second scenario now appears before this Court. To conclude that the parties did not agree in writing to consider the map artwork "for hire" would undermine the certainty and predictability which the Copyright Act seeks to promote and which the contracts establish. Moreover, such a constricted view would needlessly hobble the Act's independent contractor "for hire" provision, a concession granted to publishing interests in a recognized legislative horse swap. The parties here agreed to make Sherry and The Laser Image the holder of all rights and privileges in the work that are incident to a copyright, denying Armento the right to reproduce or use the work for any purpose without the written consent of the Defendants. See Defendants' Exhibit 11. The Plaintiff, by virtue of this language, retains the right to do or authorize none of the rights incident to copyright contained in the Act. See 17 U.S.C. § 106. The contract language expressly indicates that the specially commissioning party will have the copyrights of the author, and that writing was signed by both parties before creation of the work. As a result, this Court concludes the writing was sufficiently express to satisfy section 101(2). Because all three requirements of that statutory section were met, the map artwork was created as "work for hire" and, minus any written agreement to the contrary, copyright to it belongs to the Defendants. See 17 U.S.C. § 201.

## 2. Written Transfer of Copyright

■ In addition to claiming copyright under the "work for hire" doctrine, the Defendants also contend that the Plaintiff transferred copyright over to them in the 1987 and 1990 contracts. By statute, the ownership of a copyright may be transferred in whole or in part by any means of conveyance, and any of the exclusive rights comprised in a copyright, including any subdivision of the

---

9. Armento, in agreeing in the 1990 contract to be paid $450 per edition as compensation for his original artwork, claimed to be taking a risk that there would be an insufficient number of maps to result in his being fully paid. The Plaintiff did not estimate how much his 1990 services were worth above the amount he was paid by the Defendants. Nor did the Plaintiff refute the facts that it was Sherry who came to him with the illustrated map idea, or that Sherry retained editing control over the content of the map artwork. Armento's risk was greatest in 1987, before the Illustrated Map was a proven product, but it was Sherry who agreed to pay Armento regardless of whether the brochure succeeded. At that time, the 1987 contract called for The Laser Image to pay Armento up to $200 for Armento's costs if marketing of the map brochure failed. In addition, Armento was guaranteed $360 for work updating future editions should they occur. Thus, the heavy risks of 1987 were shouldered by Sherry. The 1990 contract presented little risk to Armento in view of the Illustrated Map's proven popularity to that date.

rights specified by section 106,[10] may be transferred and owned separately. 17 U.S.C. § 201(d)(1), (2).

Armento has not argued that the relevant contractual provisions transfer only a few copyright elements to The Laser Image; rather, he claims that the provisions do not concern copyrights at all. The Plaintiff says he signed them under the impression that they were "non-competition" clauses that merely required him to give notice to Sherry whenever the Plaintiff wanted to use or reproduce the map artwork. Yet Armento admitted in his trial testimony that the right to reproduce a work and the right to control its reproduction are central incidents to copyrights as protected under the Act.

This Court agrees. Both common sense and the law lead to the conclusion that the contractual provisions signed by Armento—whereby the "maps" and "artwork" were established as the "sole property" of the Laser Image that could not be reproduced or used by him "for any other purpose ... without the written consent" of the Laser Image"—effected total transfers of Armento's copyrights in the disputed map artwork. That the agreements omit the word "copyright" is not dispositive, for their wording clearly transfers the very copyrights Armento claims were infringed, specifically the right to control the reproduction and dissemination of these images. *Schiller*, 969 F.2d at 413 (finding transfer agreement that did not mention "copyright" sufficient).

Throughout the trial, Armento demonstrated a considerable knowledge of copyright law, arguing, for example, that the lack of technical terms in the 1987 and 1990 contracts (e.g., "copyright," "transfer," "rights") was significant because as someone familiar with copyright law, he would certainly object to the inclusion of those legally significant terms. This Court finds it too difficult to believe that a commercial artist with the Plaintiff's sensitivity to copyright issues would believe those contract provisions to be mere "non-competition" clauses.[11] While surely the better practice would have been to include the words "transfer" and "copyright," the text was sufficient to put an artist far less savvy than the Plaintiff on notice that Sherry was taking ownership—copyright ownership—of the map artwork he was commissioning.

Sherry testified that it was his intent in entering these contracts to own the copyright; Armento claimed Sherry told him the contracts did not concern copyrights. In the face of these conflicting claims (and considering the Plaintiff's trial burden to prove his infringement cause as well as the public actions of the parties), the language, which no lawyer helped draft, speaks clearly enough for itself. It indicates that the parties intended to transfer copyright in form, if not name. *Cf. Playboy*, 53 F.3d at 564.

The parties' dealings with third parties give no reason to distrust the contracts' sweeping scope. Particularly unavailing for the Plaintiff are the events of October 1992 when Armento separately contracted with the ADDO and the ADA to produce items including the 1992 map artwork for use in the "1992 Light Up Your Holidays" event. See Plaintiff's Affidavit at 3. According to the Plaintiff, the organizations contacted him

---

**10.** Section 106 provides in relevant part:

[T]he owner of copyright under this title has exclusive rights to do and to authorize any of the following:

    (1) to reproduce the copyrighted work in copies or phonorecords;

    (2) to prepare derivative works based upon the copyrighted work;

    (3) to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

    .    .    .    .    .

    (5) in the case of ... pictorial, graphic or sculptural works ... to display the copyrighted work publicly.

16 U.S.C. § 106.

**11.** At least the Plaintiff's own statements suggest that he knew that the "sole property" language was more than a mere non-competition clause requiring that he give notice before use:

    Q. Okay. Just let me back up. Did you understand the wording, though, to mean that without the written consent of Laser Image or of Doug Sherry that you could not unilaterally reproduce or license for reproduction the art work?

    A. Yeah. I think so. I think that's a reasonable man's explanation of that particular wording.

Plaintiff's Deposition, at 41.

without the involvement of Sherry or The Laser Image, and paid him directly for the work he produced. *Id.* The Plaintiff concludes that because Sherry and the Laser Image were not part of the deal (and in fact elected to stay out of it), they should be estopped from making copyright claims to the map illustrations.

However, the Defendants' actions, as well as those of the Plaintiff, were entirely consistent with the fact that The Laser Image and Sherry owned the contested copyright. First and foremost, the Plaintiff himself instructed ADDO to contact Sherry to "seek permission from Defendant for usage of 'map artwork' pursuant to agreement." Plaintiff's Affidavit at 3.[12] Second, the Plaintiff himself contacted Sherry concerning the intended usage of the map artwork. *Id.* Finally, the Plaintiff testified that it was he who placed attribution on the Light Up Your Holidays map reading "Map Reprinted With Permission From: The Laser Image." See Defendants' Exhibit 14. In all, despite the Plaintiff's focus on the Defendants' acquiescence in the deal, Sherry's holiday benevolence seems more likely the fruit of his copyright ownership rather than in derogation of it—Sherry let Armento disseminate the artwork when he could have enjoined any such publication. At all times, it was the Plaintiff, not the Defendant, who acted in accordance with the copyright privileges of the opposing party.

The contractual language transfers copyright to The Laser Image and the behavior of the two parties was at all relevant times consistent with that transfer. As a result, this Court concludes that The Laser Image owns valid copyright over the map and related artwork it commissioned Armento to produce for use in the Illustrated Map of Asheville.

### B. CONTRACT CLAIMS

The Plaintiff's two contract claims arise from the alleged failure of Sherry to properly perform duties as Plaintiff's agent in han-

dling the map artwork copyrights. See Plaintiff's Post–Trial Brief, at 10–11. Because this Court has concluded that Armento had no copyrights for Sherry to represent, those contract claims are dismissed.

### C. UNFAIR OR DECEPTIVE TRADE PRACTICES

The Plaintiff also alleges that the Defendants engaged in unfair and deceptive trade practices in violation of North Carolina's Unfair Trade Practices Act ("UTPA"), N.C.Gen. Stat. § 75–1.1, *et seq.* Armento's UTPA claim primarily concerns the Defendants' removal of the attribution bullet "Illustrations by Gregory G. Armento" from the 1994 Illustrated Map of Asheville. See Plaintiff's Pretrial Memorandum, at 10. The attribution, which Armento claims was placed on the Illustrated Maps per parol provisions added to the 1987 and 1990 contracts, appears on seven editions of the map, from 1987 to 1993. Failure to include the attribution on the 1994 map, he contends, amounts to an unfair and deceptive trade practice under the UTPA.

To prevail under the UTPA, a plaintiff must show (1) that the defendant engaged in conduct that was in or affecting commerce, (2) that the conduct was unfair or had the capacity or tendency to deceive, and (3) that the defendant's deceptive conduct proximately caused actual injury to the plaintiff. *Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond,* 80 F.3d 895 (4th Cir. 1996); *Pearce v. American Defender Life Ins. Co.,* 316 N.C. 461, 343 S.E.2d 174, 179–80 (1986).

While it is true that what "constitutes an unfair or deceptive trade practice is a somewhat nebulous concept," and though courts have traditionally construed the statute liberally, *Gilbane,* 80 F.3d at 902, 903, Armento's claim fails to allege an actionable violation under that permissive standard. Putting aside the Plaintiff's failure to establish convincingly that he and Sherry had contracted to place attribution on the maps,[13]

---

**12.** The Court notes that this affidavit passage signals that the Plaintiff understands the 1990 agreement as covering not just the Illustrated Map brochure but the commissioned artwork he contributed to it.

**13.** The attribution did appear on the 1987–1993 maps, but Sherry claimed it was due to his wanting to help Armento out rather than any contractual requirement. Armento provided no evidence that he provided separate consideration

the Court concludes that even had they so agreed, the omission of Armento's name from the 1994 map did not amount to an unfair or deceptive trade practice as prohibited by the UTPA.

▉ While there can be no doubt that Sherry directed that Armento's name not appear on the 1994 map, there can also be no doubt that the removal of his name was not unfair or deceptive in any UTPA-recognizable sense. Taken alone, Sherry's supposed breach of contract, even if intentional, certainly would not trigger the Act.[14] *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530 (4th Cir.1989). The Plaintiff must show that egregious or aggravating circumstances place the Defendants' actions within the statute. *Allied Distrib., Inc. v. Latrobe Brewing Co.*, 847 F.Supp. 376 (E.D.N.C.1993). In considering those circumstances, the Court notes that while the intent of the Defendant and his good faith are irrelevant, the remedies provided pursuant to the Act are in nature equitable. *Chastain v. Wall*, 78 N.C.App. 350, 337 S.E.2d 150 (1985), *cert. denied*, 316 N.C. 375, 342 S.E.2d 891 (1986), *Moretz v. Northwestern Bank*, 67 N.C.App. 312, 313 S.E.2d 8, *cert. denied*, 311 N.C. 761, 321 S.E.2d 141 (1984).

Considering the total circumstances surrounding the Defendants' actions, this Court finds the omissions of Armento's name was anything but the kind of "immoral, unethical, oppressive, unscrupulous, or substantially injurious" act that would trigger coverage by the Act. *Branch Banking & Trust Co. v. Thompson*, 107 N.C.App. 53, 418 S.E.2d 694, 700, *disc. rev. denied*, 332 N.C. 482, 421 S.E.2d 350 (1992) (quoted in *Gilbane Bldg.*, 80 F.3d at 902).

On the contrary, the events surrounding production of the 1994 map make the omission of Armento's name appear quite defensible. Following the 1993 publication of the Illustrated Map of Asheville in several new contexts, the relationship between Armento and Sherry deteriorated quickly. On July 26, 1993, Armento wrote to Sherry claiming copyright in the map artwork and offering to negotiate terms for a contract covering copyright in future editions of the map, adding that he knew "this may be a source of distress for you and may be [sic] even a source of betrayal...." Defendants' Exhibit 15.[15] Sherry, who believed he already owned copyright to the map artwork, chose instead to contract with someone else, a Joe Vogler, to update the artwork and complete the Illustrated Map of Asheville. Vogler performed under his contract and the map appeared in 1994 without credit to Armento.

In short, the professional and personal relation between Sherry and Armento had been severed. Sherry hired a new graphic artist to complete the 1994 map; the new artist worked from map artwork The Laser Image purchased from Armento in 1990. Given Sherry's copyright in the artwork, his hiring of an artist other than Armento to update the map, and his developing acrimony with the Plaintiff, his omission of the Plaintiff's name was not "immoral, unethical, oppressive, unscrupulous, or substantially injurious."[16]

---

for this alleged extra provision, nor did he explain why such a condition did not appear in the written contracts.

**14.** Again, the Court doubts that the Defendants had any contractual obligations to breach. Moreover, whatever agency contract obligations that the Plaintiff contends Sherry undertook evaporated on January 10, 1994, at the latest: "During our last meeting on January 10, 1994 you were told not to represent my interest on any of these matter [sic]; so for the second time, stop representing my interest in regards to the illustrations on any matter.... I consider your past actions to be a breach of our contracts, and I expect you to return all my original artwork [cease] from printing any more reproductions of my artwork immediately." Plaintiff's Complaint Exhibit 5 (March 8, 1994 letter from Armento to Sherry).

**15.** The Plaintiff, in his deposition, characterized the deterioration this way: "[In 1993] Doug Sherry and I found out that we could not come to any agreement, and Doug Sherry was told that our relationship is terminated. Doug Sherry was also told in a letter that I own the copyright, and Doug Sherry was also shown my copyright registration and the illustration." Plaintiff's Deposition, at 126–27.

**16.** In any event, Armento fell far short of explaining how the Defendants' omission caused him concrete damages. Not only did the Plaintiff fail to show how the 1994 map, produced with cover artwork decidedly different than what Armento had drawn in the past and published without his name, "besmirched" his reputation, he testified at trial that he was working full time and had

This Court is unable to discern any factual or legal merit basis for sustaining this UTPA-based claim.

■ The Plaintiff also alleges that the Defendants violated the UTPA by wrongdoings in connection with the map artwork copyright. See Plaintiff's Post–Trial Brief, at 12. Because this Court has concluded that Armento had no copyrights that could be the subject of or effected by unfair or deceptive trade practices, that cause of action also fails.[17]

## D. TRADEMARK AND TRADE DRESS

Finally the Court addresses the Plaintiff's trademark and trade dress infringement claims. Having considered all of the evidence and arguments presented by the Plaintiff, both oral and written, the Court concludes these two claims are devoid of merit.

To make out a claim of trademark or trade dress infringement, a plaintiff must show, as a threshold matter, that he has a right to trademark or trade dress he claims are being infringed. Thomas McCarthy, *McCarthy on Trademarks*, §§ 16.01, 16.03, 16.13 (3d ed.1992). The right to trademark or trade dress protection is based on prior use and goes to the entity who first uses the mark or dress in connection with a particular line of business. *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 819 (1st Cir. 1987); *Perini Corp. v. Perini Const. Co.*, 715 F.Supp. 719, 721 (D.Md.1989), *rev'd on other grounds*, 915 F.2d 121 (4th Cir.1990).

■ The Plaintiff has produced no convincing evidence contradicting the Defendants' claim that they, through development, use and sale of the Illustrated Map of Asheville, acquired first priority to all trademark and trade dress rights of the Illustrated Map

of Asheville. In the years 1987–1993, The Laser Image used the brochure product literally tens-of-thousands of times, gaining profit therefrom and spreading business goodwill to thousands of consumers. Armento, after getting The Laser Image's permission, sold a copy of the underlying artwork—once. Notably, that one sale was not of the Illustrated Map of Asheville (the subject of his trademark and trade dress claims) but of the underlying artwork (to which the Defendants owned copyright). See Plaintiff's Affidavit, at 3.

However significant the Plaintiff's contributions to the underlying artwork were, they loom small next to the fact that the Defendants alone obtained rights to the Illustrated Map trademark and trade dress by commercially "using" it from 1987 up until this very day. See *Maryland Stadium Authority v. Becker*, 806 F.Supp. 1236, 1239 (D.Md.1992), *aff'd*, 36 F.3d 1093 (4th Cir.1994); *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1200 (9th Cir.1979). Plaintiff has failed to demonstrate that he established priority to the Illustrated Map of Asheville trademark and trade dress through use in any line of business,[18] and as a result has failed to show that he owns trademark and trade dress rights that could be protected under the Lanham Act. See 15 U.S.C. § 1125(a); *Volkswagenwerk*, 814 F.2d at 817; *Perini Co.*, 715 F.Supp. at 721.

## V. ORDER

For the reasons stated *infra*, the Court finds in favor of the Defendants on all claims brought by the Plaintiff, and those claims will be dismissed by way of Judgment filed contemporaneously with this Memorandum.

---

two companies seeking electronic versions of the map artwork.

17. Insofar as Armento was seeking to bring a unfair or deceptive trade practice claim under state law for copyright violations, that action would be preempted. The Copyright Act preempts any legal or equitable right under state law which is "equivalent" to any exclusive rights within general scope of copyright, so that state law cannot make copyright infringement violation of state unfair or deceptive trade practices.

See 17 U.S.C. § 301(a); *Nintendo of America v. Aeropower Co., Ltd.*, 34 F.3d 246 (4th Cir.1994); *Patsy Aiken Designs, Inc. v. Baby Togs, Inc.*, 701 F.Supp. 108 (E.D.N.C.1988).

18. Under the Lanham Act, "use" means "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127 ("Use in Commerce").

## JUDGMENT

For the reasons stated in the Memorandum of Opinion filed herewith,

**IT IS, HEREBY, ORDERED, ADJUDGED, AND DECREED** that the Plaintiff take nothing from Defendants, that this action be **DISMISSED ON THE MERITS**, and that the Defendants recover from the Plaintiff their costs of this action as taxed by the Clerk of Court.