[No. S083632. Apr. 2, 2001.]

HEATHER PRESTON, Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

198

**COUNSEL**

Nicholas Blonder for Plaintiff and Appellant.

Daniel E. Abraham; Nielsen, Merksamer, Parrinello, Mueller & Naylor, John E. Mueller and Eric J. Miethke for Graphic Artists Guild as Amicus Curiae on behalf of Plaintiff and Appellant.

Bill Lockyer, Attorney General, and Paul D. Gifford, Assistant Attorney General, for Defendant and Respondent.

**OPINION**

**BROWN, J.**—In this case, we consider whether: (1) a taxpayer who fails to explicitly raise a contention in her claim for refund may still raise that contention in a subsequent lawsuit for that refund; and (2) a copyright interest in artwork, transferred in conjunction with the temporary transfer of the tangible artwork itself, is subject to sales tax. We conclude that a refund claim sufficiently raises any contention that is intertwined with or clearly implied from contentions explicitly raised in the claim. We further conclude that Revenue and Taxation Code[1] sections 6011, subdivision (c)(10) and 6012, subdivision (c)(10) (hereafter section 6011(c)(10) and section 6012(c)(10)) apply to the transactions at issue in this case and exempt the copyright transfers from taxation.

### FACTUAL BACKGROUND

Heather Preston is a professional artist. From 1981 to 1993, Preston entered into a number of written agreements to provide artwork for use as book illustrations and rubber stamp designs (collectively, Agreements).

Under the terms of the first agreement, dated August 11, 1981, Preston provided Celestial Arts, a book publisher, with eight illustrations for Re-member the Secret, a children's book. Celestial Arts received "the right to reproduce the artwork in the book and in publicity and promotion connected

---

[1]All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

with the book." In return, Celestial Arts gave Preston "a 5% of cash received royalty on books sold" and paid her $1,500 as an advance against future royalties.

From 1988 to 1993, Preston entered into a series of agreements with All Night Media, a rubber stamp manufacturer. The agreements encompassed 54 designs created by Preston and gave All Night Media "[a]ll rights for the use of [Preston's] artwork on any and all rubber stamp products. . . ." In return, Preston received a flat fee upon publication of the first All Night Media catalog containing the designs and an additional amount in the form of either a flat fee for each publication of the designs in a subsequent catalog or a 5 percent royalty on sales.

In the last agreement, Preston contracted with Enchanté, a book publisher, to supply illustrations for a children's book, The Rainbow Fields. Enchanté acquired "all of the exclusive rights comprised in the copyrights" contained in these illustrations, including the "unlimited perpetual right to sell, license, distribute, and otherwise use" these copyrights in any media. In return, Preston received a royalty from Enchanté on all book, calendar and poster sales containing the illustrations and a $7,500 advance on these royalties. Preston also retained the right to reproduce the illustrations "solely for portfolio and self-promotion purposes."

Pursuant to these Agreements, Preston transferred "finished artwork in tangible form . . . ." The clients "then copied or reproduced images from this finished artwork" for use in their products and returned the tangible artwork to Preston. Aside from those rights in the artwork expressly transferred under the Agreements, Preston retained all other rights in the artwork, including title.

In 1994, the State Board of Equalization (Board) conducted a sales and use tax audit of Preston's business records for the period of January 1, 1990, through December 31, 1993 (the audit period). The Board eventually determined that Preston owed sales tax in the amount of $1,711.82 and interest in the amount of $321.44 based on the amount of royalties she received from the Agreements during the audit period.

Preston paid the tax claimed due and filed a petition for redetermination of her tax liability. One month later, Preston timely submitted a claim for refund. In her six-page claim, Preston raised a number of objections to the assessed tax. For example, she argued that California Code of Regulations, title 18, section 1501 (hereafter Regulation 1501)—which specifically exempts a manuscript submitted for publication from sales tax—precludes

taxation of the proceeds from her Agreements. She also claimed that these proceeds were not taxable because she only transferred "the right of reproduction and the artwork is returned to [her] for [her] files. Hence, a 'sale' of original artwork has not occurred."

After a hearing, the Board concluded that the royalties were taxable gross receipts and denied Preston's petition for redetermination. Preston then paid the interest due. Soon after, the Board denied her claim for refund.

Preston then filed the instant action, seeking a refund of the sales tax and interest that she paid. In her complaint, Preston alleged that "[t]he sales tax paid by plaintiff [Preston] should be refunded because the use rights transferred by her were intangible property." After a one-day hearing, the trial court found that "the items sold by Plaintiff [Preston] were tangible personal property, and not intangible property" and entered judgment for the Board.

The Court of Appeal affirmed. In support, the court concluded that: (1) Preston waived any claim premised on the nontaxability of the Agreements' transfer of copyrights; (2) attainment of the tangible artwork was the true object of the Agreements because they "would have been worthless" without the tangible artwork; and (3) the Agreements transferred "possession . . . of tangible personal property for a consideration" as understood in section 6006, subdivision (a).

We granted review to determine whether: (1) an administrative claim alleging that the taxpayer transferred only the right to reproduce and did not sell her artwork sufficiently raises a claim that the transaction involved the transfer of nontaxable copyrights; and (2) a taxpayer who temporarily transfers possession of tangible artwork solely for reproduction in books and merchandise but otherwise retains ownership of the artwork has to pay sales tax.

DISCUSSION

I

 As a preliminary matter, we must determine whether Preston has exhausted her administrative remedies by sufficiently raising the copyright issue in her claim for refund. Although the Board concedes that Preston "alleges that she transferred solely intangible property," it contends she did not sufficiently allege that the transactions were nontaxable transfers of copyrights. Thus, she failed to exhaust her remedies as to any claim premised on federal copyright law. We disagree.

█ Before filing suit for a tax refund, a taxpayer must present a claim for refund to the Board. (§ 6932.) The claim "shall be in writing and shall state the specific grounds upon which the claim is founded." (§ 6904, subd. (a).) The purpose of these statutory requirements is to ensure that the Board receives sufficient notice of the claim and its basis. (See *Wertin v. Franchise Tax Bd.* (1998) 68 Cal.App.4th 961, 977 [80 Cal.Rptr.2d 644] ["the purpose of the statute is to put the board on notice of a claim"].) The Board then has an opportunity to correct any mistakes, thereby conserving judicial resources. (See *Atari, Inc. v. State Bd. of Equalization* (1985) 170 Cal.App.3d 665, 673 [216 Cal.Rptr. 267] (*Atari*).)

Any lawsuit against the Board must be based "on the grounds set forth in the claim" for refund. (§ 6933.) It may not include issues "*not* raised in the claim." (*Jimmy Swaggart Ministries v. State Bd. of Equalization* (1988) 204 Cal.App.3d 1269, 1290 [250 Cal.Rptr. 891], italics added, affd. *sub nom. Jimmy Swaggart Ministries v. Cal. Bd. of Equalization* (1990) 493 U.S. 378 [110 S.Ct. 688, 107 L.Ed.2d 796].) "The claim for refund thus frames and restricts the issues for litigation." (*American Alliance Ins. Co. v. State Bd. of Equalization* (1982) 134 Cal.App.3d 601, 609 [184 Cal.Rptr. 674, 30 A.L.R.4th 865].) Indeed, courts "are without jurisdiction to consider grounds not set forth in the claim." (*Atari, supra,* 170 Cal.App.3d at p. 672.)

Despite these limits on actions against the Board, a taxpayer need not expressly raise a contention in order to meet the statutory exhaustion requirements. Where the contention is intertwined with contentions expressly raised in the refund claim, courts may consider that contention even though the claim did not explicitly raise it. (See *Montgomery Ward & Co. v. Franchise Tax Bd.* (1970) 6 Cal.App.3d 149, 164-165 [85 Cal.Rptr. 890] (*Montgomery Ward*) [considering unstated contentions because they were "intertwined" with contentions raised in the refund claim].) In other words, unstated contentions clearly implied from contentions expressly raised in a claim for refund are sufficiently stated for purposes of exhaustion. (See *Wallace Berrie & Co. v. State Bd. of Equalization* (1985) 40 Cal.3d 60, 66, fn. 2 [219 Cal.Rptr. 142, 707 P.2d 204] (*Wallace Berrie*) [taxpayer satisfied the exhaustion requirement by implicitly raising the contention in his refund claim].)

█ In this case, Preston more than sufficiently raised the copyright issue in her claim for refund. First, the contention in her claim that the transactions at issue involve only the transfer of the "right of reproduction" and not the " 'sale' of original artwork" sufficiently conveys her reliance on federal copyright law. Because the right "to reproduce the copyrighted work" is one of the rights given to copyright owners by statute (17 U.S.C.

§ 106), Preston's refund claim, by definition, raises a contention predicated on federal copyright law.

Second, Preston's discussion of Regulation 1501 adequately raises the copyright issue. In her refund claim, she analogizes an illustrator who submits illustrations for publication to the writer in Regulation 1501 who submits a manuscript for publication and asks "[w]hy should one be taxed differently from the other?"[2] Because the manuscript example in Regulation 1501 is premised on the nontaxability of a copyright transfer (see *Navistar Internat. Transportation Corp. v. State Bd. of Equalization* (1994) 8 Cal.4th 868, 877 [35 Cal.Rptr.2d 651, 884 P.2d 108] (*Navistar*)), Preston's analogy implicitly alleges that her transactions are not taxable because they involve only the transfer of nontaxable copyrights.

The absence of the word "copyright" or an explicit reference to federal copyright law is immaterial. Preston's contention that the transactions were nontaxable transfers of copyrights is, without question, intertwined with and clearly implied from the contentions in Preston's refund claim. Thus, she has satisfied the statutory exhaustion requirements. (*Wallace Berrie, supra,* 40 Cal.3d at p. 66, fn. 2; *Montgomery Ward, supra,* 6 Cal.App.3d at pp. 164-165.)

Finally, the Board's reliance on its ignorance of federal copyright law is disingenuous. Many transactions involve copyright transfers. Presumably, the Board must deal with copyright issues when determining the tax consequences of these transactions. The Board must therefore have at least a passing familiarity with copyright law. At a minimum, the Board should be able to recognize that a reference to the right to reproduce—the best known

---

[2]*Specifically, Preston's claim for refund states:*

"Concerning book royalties: The facts are that while an illustrator and a writer both work on the same book and are on the same royalty basis, only the illustrator pays sales tax on those royalties while the writer pays none! Is this not totally unfair? An artist uses paper for the same purpose, to convey ideas. Are royalties on a picture book without words taxable and a word book exempt? Both are books. The writer's manuscript is not the only way to convey an 'idea'. 'A picture is worth a thousand words.' For example, a political cartoon may contain no words at all, yet tell a story. This is clearly discriminatory and unfair.

"Unless I am missing something, writers are considered to convey ideas while illustrators are presumed not to. The Board's reasoning is as follows: 'An idea may be expressed in the form of tangible personable [*sic*] property and that property may be transferred for a consideration from one person to another; however, the person transferring the property may still be regarded as the consumer of the property. Thus, the transfer to a purchaser of an original manuscript by the author thereof, for the purpose of publication, is not subject to taxation.' (Reg. 1501.) If the words 'illustrator' and 'illustrations' are substituted for 'author' and 'manuscript' respectively in the above reference, it is obvious that they would equally apply. Why should one be taxed differently from the other? This seems to be the only equitable solution, as there is no honorable reason why they should be treated differently."

right given to copyright owners—implicates federal copyright law. (See 17 U.S.C. § 106(1).) Indeed, the right to reproduce is embodied in the word "copyright." Accordingly, Preston sufficiently raised the copyright issue for exhaustion purposes.

## II

We now turn to the propriety of assessing a sales tax in this case and begin by determining whether Preston's Agreements are completely exempt from taxation because they fail to create transfers of tangible property for consideration. Citing the manuscript example found in Regulation 1501, Preston and amicus curiae Graphic Artists Guild contend the Agreements created *no* transfers of tangible property for consideration because the transfers of artwork were incidental to the transfers of copyrights in the artwork. Thus, *all* proceeds from the Agreements should be exempt from taxation. The Board counters that the temporary transfers of artwork pursuant to the Agreements constitute taxable leases. As explained below, we find that the Agreements are not wholly exempt from sales tax because they created taxable transfers of tangible property.

California law imposes a retail tax on "the gross receipts . . . from the sale of all tangible personal property . . . ." (§ 6051.) A "sale" means "[a]ny transfer of title or possession, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration" (§ 6006, subd. (a)), and includes "[a]ny lease of tangible personal property in any manner or by any means whatsoever, for a consideration" (§ 6006, subd. (g)). " 'Tangible personal property' means personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses." (§ 6016.)

Because these provisions apply only to tangible personal property, intangible personal property is not subject to sales tax. (See *Navistar, supra,* 8 Cal.4th at p. 874.) Although there is no statutory definition of intangible property, "such property is generally defined as property that is a 'right' rather than a physical object." (*Id.* at p. 875, quoting *Roth Drug, Inc. v. Johnson* (1936) 13 Cal.App.2d 720, 734 [57 P.2d 1022].) "Thus, for purposes of the law of taxation, intangible property is defined as including personal property that is not itself intrinsically valuable, but that derives its value from what it represents or evidences." (*Navistar,* at p. 874.)

Despite these definitions, distinguishing between tangible and intangible personal property for taxation purposes has proven troublesome. Much of the problem stems from the fact that the value of a tangible object

often depends on the "intangible rights and privileges" associated with the object. (*Roehm v. County of Orange* (1948) 32 Cal.2d 280, 285 [196 P.2d 550].) Even where the intangible right—i.e., a copyright—is wholly distinct from the material object (see 17 U.S.C. § 202), determining the tax consequences of a transaction involving the transfer of such a right has been difficult because the transaction often includes the concurrent transfer of tangible property. (See, e.g., *Simplicity Pattern Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 900, 906 [167 Cal.Rptr. 366, 615 P.2d 555] (*Simplicity Pattern*) [transfer of film negatives and recordings and their copyrights].)

Regulation 1501 has exacerbated the confusion. Regulation 1501 ostensibly defines the criteria for "determining whether a particular transaction involves a *sale of tangible personal property* or the transfer of tangible personal property incidental to the *performance of a service* . . . ." (Italics added.) It provides that "[t]he basic distinction . . . is one of the true objects of the contract; that is, is the real object sought by the buyer the service per se or the property produced by the service. If the true object of the contract is the service per se, the transaction is not subject to tax even though some tangible personal property is transferred." (*Ibid.*)

The "true object" test described in Regulation 1501, by its terms, applies only to transactions involving "the performance of a service." The regulation, however, contains an example that does *not* appear to involve the performance of a service. (See *Culligan Water Conditioning v. State Bd. of Equalization* (1976) 17 Cal.3d 86, 96 [130 Cal.Rptr. 321, 550 P.2d 593] ["Service is defined as 'performance of labor for the benefit of another' "].) In the so-called manuscript example, an author transfers "an original manuscript" to a publisher "for the purpose of publication . . . ." (Reg. 1501.) This transfer appears to involve the transfer of a copyright—and not the performance of a service. (See *Navistar, supra,* 8 Cal.4th at p. 877.) Nonetheless, Regulation 1501 applies the true object test and concludes that the transfer "is not subject to taxation" because the true object of the transaction is the acquisition of an intangible property right.[3] In doing so, Regulation 1501 suggests that a transfer of tangible property is not taxable if the transfer is incidental to the transfer of intangible property.

---

[3]The manuscript example in Regulation 1501 states: "[A]n idea may be expressed in the form of tangible personal property and that property may be transferred for a consideration from one person to another; however, the person transferring the property may still be regarded as the consumer of the property. Thus, the transfer to a publisher of an original manuscript by the author thereof for the purpose of publication is not subject to taxation. The author is the consumer of the paper on which he has recorded the text of his creation. However, the tax would apply to the sale of mere copies of an author's work or the sale of manuscripts written by other authors where the manuscript itself is of particular value as an item of tangible personal property and the purchaser's primary interest is in the physical property. Tax would also apply to the sale of artistic expressions in the form of paintings and sculptures even though the work of art may express an original idea since the purchaser

We have, however, rejected such a broad interpretation of the manuscript example. In *Simplicity Pattern*, we held that the sale of "film negatives and master recordings used to make audiovisual" training materials created a taxable transfer of tangible property for consideration. (*Simplicity Pattern*, *supra*, 27 Cal.3d at p. 903.) To reach this holding, we concluded that "a sale" does not become "nontaxable whenever its principal purpose is to transfer the intangible content of the physical object being sold" (*id.* at p. 909), and found Regulation 1501 inapplicable because the "transfer was not incidental to any service" (*Simplicity Pattern*, at p. 912). We also distinguished plaintiff's acquisition of negatives and recordings from the manuscript example in Regulation 1501 because "a manuscript furnishes only verbal guidance," while the negatives and recordings were physically useful in the manufacturing process. (*Simplicity Pattern*, at p. 909.) Therefore, the negatives and recordings were analogous to printing plates, and the sale of these negatives and recordings was taxable. (*Id.* at pp. 909, 912.)

Since *Simplicity Pattern*, appellate courts have consistently held that a transfer of tangible property physically useful in the manufacturing process in conjunction with a transfer of intangible property rights in that property results in a taxable sale. In *Capitol Records, Inc. v. State Bd. of Equalization* (1984) 158 Cal.App.3d 582, 587 [204 Cal.Rptr. 802] (*Capitol Records*), the Court of Appeal found taxable "royalties [paid] in exchange for ownership of master tapes produced by" independent production companies financed by the plaintiff. Relying on *Simplicity Pattern*, the court concluded that Regulation 1501 did not exempt these transactions from taxation because the tapes "were manifestly useful in the manufacturing process, [and] were not furnished as incidents to any service . . . ." (*Capitol Records*, at p. 596.)

Applying the same reasoning, the Court of Appeal in *A & M Records, Inc. v. State Bd. of Equalization* (1988) 204 Cal.App.3d 358, 376 [250 Cal.Rptr. 915] (*A & M Records*), concluded that temporary transfers of master tapes created taxable transfers of tangible property. In *A & M Records*, the plaintiffs obtained an exclusive license to use master tapes and duplicate master tapes owned by its subsidiaries. In return, the plaintiffs paid its subsidiaries royalties "based upon sales of records and tapes . . . ." (*Id.* at p. 365.) The plaintiffs then leased these duplicate master tapes to record clubs, which used them to produce records and tapes and received royalties from these clubs "on the basis of the number of records and tapes sold . . . ." (*Ibid.*) Based on *Simplicity Pattern* and *Capitol Records*, the court held that these royalty payments were taxable. In doing so, the court found Regulation 1501 inapplicable because the master tapes "were essential in the

---

desires the tangible object itself; that is, since the true object of the contract is the work of art in its physical form."

ultimate production of the records and tapes through which plaintiffs made their revenues" (*A & M Records*, at p. 376). Unlike the manuscript in Regulation 1501, "the master tapes are used in the production of records and tapes and are thus not used solely for their intellectual or artistic content." (*A & M Records*, at p. 376.)

Together, these decisions establish that any transfer of tangible property *physically useful* in the manufacturing process is subject to sales tax even though the true object of the transfer is an intangible property right like a copyright. (See *Simplicity Pattern, supra*, 27 Cal.3d at p. 912 ["Their [the negatives and recordings] value as physical objects permitted measuring the tax on their sale by the price received for their entire worth"].) The purpose or nature of the transfer and the form of payment are irrelevant. (See *A & M Records, supra*, 204 Cal.App.3d at pp. 375-376; *Capitol Records, supra*, 158 Cal.App.3d at p. 596.)

Such a conclusion flows logically from the statutes defining taxable and nontaxable leases. Under subdivision (g) of section 6006, "[a]ny lease of tangible personal property *in any manner or by any means whatsoever*, for a consideration" creates a taxable transfer. (Italics added.) Section 6006.3 then broadly defines " '[l]ease' " to "include[] rental, hire and license." Only leases involving the "*use of tangible personal property* for a period of less than one day for a charge of less than twenty dollars ($20) when *the privilege to use the property* is restricted to use thereof on the premises or at a business location of the grantor of the privilege" are statutorily exempt from taxation. (*Ibid.*, italics added.) By broadly defining taxable leases and narrowly defining the exception in terms of the *use* of the tangible property, sections 6006 and 6006.3 establish that the purpose behind and duration of a transfer of tangible property are irrelevant for determining whether a taxable transfer occurred.

*Navistar* does not dictate a contrary result. *Navistar* merely held that "physical usefulness" was not "a necessary condition to taxation." (*Navistar, supra*, 8 Cal.4th at p. 879.) After *Navistar*, transfers of tangible property remain taxable even if these transfers are merely incidental to transfers of intangible property rights.

Thus, the temporary transfers of Preston's tangible artwork are taxable transfers of tangible property. Because Preston's Agreements transferred the artwork for use in a manufacturing process performed outside Preston's personal or business premises, they fall within the statutory definition of a taxable lease. (See §§ 6006, subd. (g), 6006.3.) Like printing plates, master recordings and film negatives, the tangible artwork was physically useful

and essential in the ultimate production of books and rubber stamps incorporating the copyright in the artwork. Without the physical artwork, the contracts were essentially "worthless." (*A & M Records, supra,* 204 Cal.App.3d at p. 376.) As such, the artwork is not like a manuscript, which only furnishes "verbal guidance" and is not essential to the manufacturing process. (*Simplicity Pattern, supra,* 27 Cal.3d at p. 909.) The Regulation 1501 manuscript example therefore does not govern, and the temporary transfer of Preston's artwork for purposes of reproduction is subject to sales tax. Indeed, Preston has implicitly conceded this point by declining to claim a refund of taxes attributable to her labor costs and arguing for the applicability of sections 6011(c)(10) and 6012(c)(10). Accordingly, we conclude that Preston's Agreements are not entirely exempt from taxation because they involved a transfer of tangible property for consideration.

## III

**(5a)** Even though Preston's Agreements involved transfers of tangible property for consideration, they also involved transfers of intangible property—the copyrights in the artwork—for consideration. The Board contends Preston's transfer of tangible artwork in conjunction with the transfer of copyrights in that artwork renders her transactions taxable *in their entirety*. In support, the Board cites California Code of Regulations, title 18, section 1540 (hereafter Regulation 1540) as amended in January 2000. We, however, decline to adopt the Board's contention, and, instead, hold that sections 6011(c)(10) and 6012(c)(10)—as enacted in 1993—govern Preston's Agreements and apply retroactively to exclude the copyright transfers from sales tax.

### A.

We begin by determining whether Preston's Agreements are technology transfer agreements that fall within the purview of sections 6011(c)(10) and 6012(c)(10). Section 6011 defines " '[s]ales price' " (§ 6011, subd. (a)), and section 6012 defines " '[g]ross receipts' " (§ 6012, subd. (a)). These sections are mirror images and identify the items to be included in or excluded from any calculation of the amount subject to sales tax pursuant to section 6051. In 1993, the Legislature added sections 6011(c)(10) and 6012(c)(10). These provisions are identical and *exempt* the "amount charged for intangible personal property"—specifically, a *patent or copyright* interest—transferred pursuant to a "technology transfer agreement" from taxation. (§§ 6011(c)(10)(A), 6012(c)(10)(A).) As explained below, Preston's Agreements constitute technology transfer agreements as understood in sections 6011(c)(10) and 6012(c)(10) and are governed by these provisions if they apply retroactively.

■ The rules for interpreting statutes are well established. "When construing a statute, we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.'" (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727], quoting *DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].) "The words of the statute are the starting point." (*Wilcox*, at p. 977.) If the ordinary meaning of the language "is clear and unambiguous," then we need look no further. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Otherwise, we may resort to extrinsic sources, such as the legislative history. (See *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 277 [87 Cal.Rptr.2d 222, 980 P.2d 927].)

■ Application of these rules yields one inescapable conclusion: Preston's Agreements are technology transfer agreements as understood in sections 6011(c)(10) and 6012(c)(10). We begin by examining the statutory language. Subparagraphs (A) through (C) of sections 6011(c)(10) and 6012(c)(10) state that the amount subject to sales tax does "not include": "(10)(A) The amount charged for intangible personal property transferred with tangible personal property in any technology transfer agreement, if the technology transfer agreement separately states a reasonable price for the tangible personal property. [¶] (B) If the technology transfer agreement does not separately state a price for the tangible personal property, and the tangible personal property or like tangible personal property has been previously sold or leased, or offered for sale or lease, to third parties at a separate price, the price at which the tangible personal property was sold, leased, or offered to third parties shall be used to establish the retail fair market value of the tangible personal property subject to tax. The remaining amount charged under the technology transfer agreement is for the intangible personal property transferred. [¶] (C) If the technology transfer agreement does not separately state a price for the tangible personal property, and the tangible personal property or like tangible personal property has not been previously sold or leased, or offered for sale or lease, to third parties at a separate price, the retail fair market value shall be equal to 200 percent of the cost of materials and labor used to produce the tangible personal property subject to tax. The remaining amount charged under the technology transfer agreement is for the intangible personal property transferred." Sections 6011(c)(10)(D) and 6012(c)(10)(D) then broadly define a "'technology transfer agreement'" as "any agreement under which a person who holds a patent or copyright interest assigns or licenses to another person the right to make and sell a product or to use a process that is subject to the patent or copyright interest."

Read as a whole and giving the statutory language its ordinary meaning, sections 6011(c)(10) and 6012(c)(10) unambiguously establish that the value

of a patent or copyright interest transferred pursuant to a technology transfer agreement is *not* subject to sales tax even if the agreement also transfers tangible personal property. The lone trigger for this exemption is the presence of a technology transfer agreement. In other words, these provisions exclude the value of a patent or copyright interest from taxation whenever a person who owns a patent or copyright transfers that patent or copyright to another person so the latter person can make and sell a product embodying that patent or copyright. (See §§ 6011(c)(10)(D), 6012(c)(10)(D).)

In this case, Preston owned the copyrights in the transferred artwork. (See 17 U.S.C. § 201(a).) Under the Agreements, she separately and distinctly transferred one of the rights comprised in a copyright—the right to reproduce. (17 U.S.C. § 106(1).) Pursuant to the Agreements, the transferees manufactured and sold products—i.e., books or rubber stamps—"subject to" the transferred copyright interest. (§§ 6011(c)(10)(D), 6012(c)(10)(D).) Accordingly, Preston's Agreements are technology transfer agreements as defined by paragraph (D).

The absence of the word "copyright" in most of the Agreements is irrelevant.[4] Although an assignment or license of a copyright requires a "writing" (17 U.S.C. § 204(a)), the writing need not mention the word "copyright." (See *Schiller & Schmidt, Inc. v. Nordisco Corp.* (7th Cir. 1992) 969 F.2d 410, 413 [finding a valid copyright license even though the agreement did "not mention the word 'copyright' "]; *Armento v. Laser Image, Inc.* (W.D.N.C. 1996) 950 F.Supp. 719, 733 [omission of "the word 'copyright' is not dispositive"].) Where the wording of the agreement clearly transfers one of the rights or any subdivision of the rights specified in title 17 United States Code section 106, a copyright transfer has occurred. (*Armento*, at p. 733.) All of the Agreements assign or license the right to reproduce Preston's artwork. Because the right to reproduce is one of the exclusive rights comprised in a federal copyright (see 17 U.S.C. § 106(1) ["the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: [¶] (1) to reproduce the copyrighted work in copies or phonorecords"]), the Agreements create a valid copyright assignment. (See *Schiller*, at p. 413; *Armento*, at p. 733.)

Likewise, the limited scope of the rights transferred in some of the Agreements does not mean that no copyrights were assigned or licensed. "The ownership of a copyright may be transferred in whole *or in part* by any means of conveyance or by operation of law," and "[a]ny of the exclusive rights comprised in a copyright, *including any subdivision of any of the rights specified by section 106*, may be transferred . . . and owned separately." (17

---

[4]None of the Agreements, except for the one with Enchanté, mention the word "copyright."

U.S.C. § 201(d)(1), (2), italics added.) In light of this broad language, "there would appear to be no limit on how narrow the scope of licensed rights may be and still constitute a 'transfer' of ownership, as long as the rights thus licensed are 'exclusive.' " (3 Nimmer & Nimmer, Copyright (2000) Assignments and Licenses, § 10.02[A], p. 10-21.) All of Preston's Agreements, at a minimum, transferred the exclusive right to reproduce her artwork in a particular book or on rubber stamps. Therefore, the Agreements constitute valid assignments or licenses of a copyright interest covered by sections 6011(c)(10) and 6012(c)(10). (See 17 U.S.C. § 201(d)(1), (2).)

The Agreements also do not fall outside the purview of sections 6011(c)(10) and 6012(c)(10) because they involved the transfer of artwork and not technology. The Legislature broadly defined "technology transfer agreement" to encompass the transfer of *any* copyright interest which, by definition, includes copyrights in artwork. (See 17 U.S.C. § 102(a)(5).) It did not limit the definition to transfers of *high* technology. Indeed, the Legislature could have easily done so by defining "technology transfer agreement" as an assignment or license of "the right to make and sell" a *high technology* "product or to use a" *high technology* process. (§§ 6011(c)(10)(D), 6012(c)(10)(D).) Absent such language, we will not infer such a limitation.

We further reject the Board's contention that Preston's Agreements are not technology transfer agreements because they did not license "the right to make and sell a product . . . ." (§§ 6011(c)(10)(D), 6012(c)(10)(D).) At oral argument, the Board claimed that Preston's Agreements did not transfer the right to make or sell a product because the transferees could have made or sold their books or rubber stamps without Preston's copyrights. The Board, however, misconstrues the statutory language. A technology transfer agreement need only license "the right to make and sell a product . . . *that is subject to the . . . copyright interest*." (*Ibid.*, italics added.) Because copyrights only protect "the *expression* of the idea—not the idea itself" (*Mazer v. Stein* (1954) 347 U.S. 201, 217 [74 S.Ct. 460, 470, 98 L.Ed. 630], italics added (*Mazer*))—a product "is subject to" a copyright interest (§§ 6011(c)(10)(D), 6012(c)(10)(D)), if the product is a copy of the protected expression or incorporates a copy of the protected expression. (See *Mazer*, at p. 218 [74 S.Ct. at pp. 470-471]). Here, Preston's Agreements gave the transferees the right to make and sell books or rubber stamps that incorporate a copy of her copyrighted artwork. Thus, the Agreements necessarily licensed the right to "make and sell a product . . . subject to the . . . copyright interest." (§§ 6011(c)(10)(D), 6012(c)(10)(D).)

Indeed, the Board's contention reflects a fundamental misunderstanding of the difference between patents and copyrights. ■ Patents give an owner

"the exclusive right to manufacture, use, and sell his invention." (*Zenith Radio Corp. v. Hazeltine Research, Inc.* (1969) 395 U.S. 100, 135 [89 S.Ct. 1562, 1583, 23 L.Ed.2d 129].) Thus, the license of a patent interest, by definition, gives the licensee the right to make a product or to use a process. In contrast, "copyright protects originality rather than novelty or invention—conferring only 'the sole right of multiplying copies.' " (*Mazer, supra,* 347 U.S. at p. 218 [74 S.Ct. at p. 471], fn. omitted.) Thus, the license of a copyright interest can only give the licensee the right to reproduce the copyrighted material in a product—and not the right to make and sell a product. ▌ Because sections 6011(c)(10) and 6012(c)(10) expressly exempt the assignment or license of the right to make and sell a product subject to *either* a patent *or* copyright from taxation, they must encompass agreements, like Preston's, that license the right to reproduce copyrighted material in a product to be manufactured and sold by the licensee.

In any event, the legislative history validates our interpretation of sections 6011(c)(10) and 6012(c)(10), even if the statutory language is ambiguous. These subdivisions grew out of the Board's decision in *Petition of Intel Corporation* (June 4, 1992) [1993-1995 Transfer Binder] Cal.Tax Rptr. (CCH) paragraph 402-675, page 27,873 (*Intel*). In *Intel,* petitioner licensed several patents and copyrights to other companies so they could manufacture integrated circuits embodying these patents and copyrights. As part of the license agreements, petitioner transferred tangible property consisting of "written information, instructions, schematics, database tapes, and test tapes." (*Ibid.*) The Board held that these agreements created two separate and distinct transactions for tax purposes. The first transaction involved the transfer of tangible personal property and was subject to sales tax. The second transaction involved the nontaxable transfer of intangible property. In reaching this conclusion, the Board broadly defined "intangible property" as "the license to use the information under the copyright *or* patent." (*Ibid.,* italics added.)

Soon after *Intel,* Assembly Member Charles Quackenbush introduced Assembly Bill No. 103 (1993-1994 Reg. Sess.) (Assembly Bill No. 103)—which eventually became sections 6011(c)(10) and 6012(c)(10). The express purpose of Assembly Bill No. 103 was to "implement a decision of the Board of Equalization (BOE) with regards to an appeal filed by the Intel Corporation." (Assem. Com. on Rev. & Tax., Rep. on Assem. Bill No. 103, as amended Mar. 17, 1993, p. 2; see also Cal. Dept. Finance, analysis of Assem. Bill No. 103, as amended Aug. 17, 1993, p. 1 ["the intent of this bill is to codify the Board of Equalization's (BOE) interpretation of Regulation 1501 as it applied to a technology transfer case [*Intel*] before the Board"].) To implement *Intel,* Assembly Bill No. 103 borrowed *Intel*'s broad definition

of intangible property and exempted any transfer of such property from taxation. (Compare *Intel, supra,* [1993-1995 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 402-675, p. 27,873 [holding that "the sale of intangible property which consists of the license to use the information under the *copyright or patent*" was not subject to sales tax (italics added)], with sections 6011(c)(10)(D) and 6012 (c)(10)(D) [defining " 'technology transfer agreement' " as an assignment or license of "the right to make and sell a product or to use a process that is subject to the *patent or copyright* interest" (italics added)].) In doing so, the Legislature presumably intended to adopt the plain meaning of this language and establish that the amount charged for a license to use *either* a patent *or* copyright is not taxable even if the license also transfers tangible property for consideration.

Such an understanding is confirmed by the enactment process. When Assembly Bill No. 103 reached the Senate, some analyses raised a concern that the proposed legislation was more expansive than *Intel.* "[T]he use of 'or' instead of 'and' [in the definition of technology transfer agreement] broadens the Board's Intel decision to include not only those high technology agreements in which relatively little tangible personal property is transferred along with very valuable intangible rights to make and sell a product, but also copyright agreements involving a substantial proportion of tangible personal property. If taxpayers are able to structure a contract so that a large proportion of the value of the tangible personal property is assigned to the intangible copyright—e.g., in a sale of a painting, assigning all but the price of canvas and oils to the intangible copyright to make posters of the painting—their sales tax liability would be reduced." (Sen. Com. on Rev. & Tax., analysis of proposed amends. to Assem. Bill No. 103, July 7, 1993, p. 3.) To address this concern, the Senate Revenue and Taxation Committee proposed to limit the exemption in sections 6011(c)(10) and 6012(c)(10) to patent "<u>and</u>" copyright transfers. (Sen. Com. on Rev. & Tax., analysis of proposed amends. to Assem. Bill No. 103, July 7, 1993, p. 3.)

The Senate, however, rejected this proposal and made *no* changes to the definition of "technology transfer agreement." Instead, the Senate actually broadened "the types of [agreements] that qualify for an exemption . . . ." (Assem. Floor Analysis, Conc. in Sen. Amends. to Assem. Bill No. 103, as amended Aug. 17, 1993, p. 2.) In doing so, the Senate apparently concluded that Assembly Bill No. 103 adequately addressed the concern "by requiring that a 'reasonable price' or 'fair market retail value' of like property be used to value the tangible personal property being transferred." (Sen. Com. on Rev. & Tax., rev. analysis of proposed amends. to Assem. Bill No. 103, July 7, 1993, p. 3.)

Soon after the Senate declined to limit the scope of Assembly Bill No. 103, the Board voiced its own concerns over the scope of the proposed

exemption. Noting that it "may be more broad than intended," the Board claimed that the proposed definition of technology transfer agreement would encompass licenses of copyrights in artwork, photographs, film strips and technical drawings. (State Bd. of Equalization, analysis of Assem. Bill No. 103, as amended Aug. 17, 1993, pp. 2-3, italics omitted.) The Board further acknowledged that the bill, as written, "would provide opportunities for the exclusion of a portion of gross receipts" from taxation whenever a "seller of commercial art" separately charges "for the right to make and sell copies of the original artwork." (*Ibid.*) Several legislative committees echoed these concerns: "[T]he exemption in this bill is somewhat broader than provided under board interpretation, because the bill exempts transactions concerning agreements which license patents or copyright interests, whereas the existing board interpretation concerns licenses of patent and copyright interests. BOE indicates that this bill could exempt many transactions, such as licenses of photographs, film strips or other artwork which currently are subject to taxation." (Appropriations Com., Fiscal Summary of Assem. Bill. No. 103, as amended Aug. 17, 1993, p. 1; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill. No. 103, as amended Aug. 17, 1993, p. 2; see also Cal. Dept. Finance, analysis of Assem. Bill No. 103, as amended Aug. 17, 1993, p. 3 ["Because this bill refers to patents or copyrights, there is some concern that it may broaden the Intel decision to include not only high technology agreements where tangible personal property is transferred with very valuable intangible rights to make and sell a product, but also copyright agreements involving a substantial proportion of tangible personal property"].)

Thus, the Legislature was undoubtedly aware that the language of Assembly Bill No. 103 exempted *any* patent *or* copyright transfer from taxation, including transfers of copyrights in artwork. Nonetheless, the Legislature enacted this broad language *without* change. (Compare Stats. 1993, ch. 887, § 1, pp. 4826-4828 with Sen. Amend. to Assem. Bill No. 103, Aug. 17, 1993.) This decision to adopt the broad language of Assembly Bill No. 103 despite repeated warnings about its scope strongly signals a legislative intent to apply sections 6011(c)(10) and 6012(c)(10) to copyrights in artwork.

The statement of intent in the 1993 legislation enacting sections 6011(c)(10) and 6012(c)(10) does not support a contrary interpretation. This statement provides that: "It is also the intent of the Legislature that the amendments made by this act not create any inference regarding the application of the Sales and Use Tax Law to other transactions involving the transfer of both intangible rights and property and tangible personal property." (Stats. 1993, ch. 887, § 3, p. 4831.) This language merely limits the scope of these provisions to those transfers of intangible property expressly

encompassed within the statutory definition of "technology transfer agreement." In other words, the sales tax exemption created by sections 6011(c)(10) and 6012(c)(10) applies only to the transfer of a patent or copyright interest—and *no other* transfer of an intangible right or property such as a trade secret.

The Board's January 2000 amendments to Regulation 1540, even if they apply retroactively, do not alter our conclusion.[5] ▮ Although a regulation enacted by the Board " 'is entitled to great weight' " (*International Business Machines v. State Bd. of Equalization* (1980) 26 Cal.3d 923, 930-931 [163 Cal.Rptr. 782, 609 P.2d 1], quoting *Rivera v. City of Fresno* (1971) 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793]), we will not apply that regulation unless it " '(1) is "within the scope of the authority conferred" [citation] and (2) is "reasonably necessary to effectuate the purpose of the statute." [Citation.]' " (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 322 [87 Cal.Rptr.2d 423, 981 P.2d 52], quoting *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 411 [128 Cal.Rptr. 183, 546 P.2d 687].) ▮ The present version of Regulation 1540 makes the transfer of a "copyright, or subpart of a copyright (such as a right to reproduce or to prepare derivative works)" in a photograph or work of art subject to sales tax whenever there is a "transfer by a tangible medium of" that photograph or work of art. (*Id.*, subd. (d)(4).) In doing so, Regulation 1540 conflicts with sections 6011(c)(10) and 6012(c)(10), which expressly exempt the transfer of a copyright interest from taxation even if there is a corresponding transfer of tangible property. As such, Regulation 1540 exceeds the scope of the Board's authority and is invalid.[6] (See *Agnew*, at p. 322.)

Our previous decisions are consistent with our interpretation of sections 6011(c)(10) and 6012(c)(10). For example, in *Navistar*, we held that the

---

[5]Subdivision (d)(4) of Regulation 1540 provides in relevant part: "Charges for the transfer by a tangible medium of a photograph or of finished art for purposes of reproduction are taxable even though there is no transfer of title to the person reproducing the photograph or work of art. Charges for the right to use the photograph or finished art which has been transferred by tangible medium in the production of tangible personal property are taxable. Charges for a license, copyright or subpart of a copyright (such as a right to reproduce or to prepare derivative works) to exploit the photograph or finished art are taxable if they are sold along with the photograph or finished art transferred by tangible media or they are sold by a subsequent contract entered into within one year of the original transfer of the photograph or finished art."

[6]For the same reason, former Regulation 1540 and Annotations Nos. 295.0460, 330.3540 and 420.0280 issued by the Board (2 State Bd. of Equalization, Bus. Taxes Law Guide, Sales & Use Tax Annots. (1999) pp. 3773, 4182, 4578) are invalid to the extent they provide for the taxation of copyright transfers governed by sections 6011(c)(10) and 6012(c)(10). (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8 [78 Cal.Rptr.2d 1, 960 P.2d 1031] ["agency interpretations are not binding or necessarily even authoritative"].)

purchase of drawings and designs and manuals and procedures containing trade secrets were fully taxable as a sale of tangible personal property. We based our holding in part on the absence of a "separate and distinct transfer of an intangible property right." (*Navistar, supra*, 8 Cal.4th at pp. 877-878, fn. omitted.) Consequently, we declined to apply sections 6011(c)(10) and 6012(c)(10), because "the transfer of patents and copyrights" was not at issue. (*Navistar*, at p. 880.) In contrast, the Agreements in this case involve the separate and distinct transfer of a copyright—an intangible right distinct from "any material object in which the work is embodied." (17 U.S.C. § 202; see also Civ. Code, § 982, subd. (c) [transfer of tangible artwork does not transfer the "right of reproduction" absent an express written agreement].) Thus, *Navistar* is distinguishable. For the same reason, *Intellidata, Inc. v. State Bd. of Equalization* (1983) 139 Cal.App.3d 594, 598-599 [188 Cal.Rptr. 850], *Albers v. State Bd. of Equalization* (1965) 237 Cal.App.2d 494, 496-497 [47 Cal.Rptr. 69], and *People v. Grazer* (1956) 138 Cal.App.2d 274, 278-279 [291 P.2d 957]—which do not involve the transfer of a patent or copyright—are inapposite.

*Michael Todd Co. v. County of Los Angeles* (1962) 57 Cal.2d 684 [21 Cal.Rptr. 604, 371 P.2d 340], is also distinguishable. In *Michael Todd*, we held that the value of copyrights may be included in the valuation of a tangible object for purposes of calculating an ad valorem property tax. In the process, we reasserted "[t]he propriety of including nontaxable intangible values in the valuation of otherwise taxable property . . . ." (*Id.* at p. 694.) We did not, however, hold that "such values are subsumed [in the value of tangible property] as a matter of law." (*Shubat v. Sutter County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 794, 804 [17 Cal.Rptr.2d 1].) Thus, *Michael Todd* does not preclude the Legislature from excluding the value of patents or copyrights transferred in conjunction with tangible personal property from the retail sales tax.

Likewise, our decision in *Simplicity Pattern* is consistent with our interpretation of sections 6011(c)(10) and 6012(c)(10). In *Simplicity Pattern*, the plaintiff sold "film negatives and master recordings used to make audiovisual" training materials. (*Simplicity Pattern, supra*, 27 Cal.3d at p. 903.) The Board assessed the sales tax on these transactions using the value of the item stated in the inventory accounts on the plaintiff's books. (*Id.* at p. 904.) Because the inventory accounts calculated this value based on the "costs of materials and services" used in producing the items, the Board, in effect, taxed the value of the tangible personal property sold by the plaintiff. (*Ibid.*; *id.* at p. 904, fn. 1.) Thus, by affirming the Board's assessment, we implicitly followed the approach outlined in sections 6011(c)(10) and 6012(c)(10). Indeed, sections 6011(c)(10)(C) and 6012(c)(10)(C) establish that the "retail

fair market value . . . of the cost of materials and labor used to produce the tangible personal property subject to tax" may be used to calculate the sales tax on any transfer of tangible property in a technology transfer agreement. To the extent that *Simplicity Pattern Co. v. State Bd. of Equalization, supra,* 27 Cal.3d 900, suggests that copyrights transferred in a technology transfer agreement may be taxed, however, sections 6011(c)(10) and 6012(c)(10) supersede it.[7]

Finally, our interpretation is consistent with the manuscript example in Regulation 1501. A manuscript "furnishes only verbal guidance to editors and typesetters" and is not physically useful in the reproduction process. (*Simplicity Pattern, supra,* 27 Cal.3d at p. 909, fn. omitted.) Because a publisher that obtains temporary possession of a manuscript does not physically use the manuscript in the publication process, the publisher receives no taxable benefit from this transfer of tangible personal property. (Cf. § 6006.3 [defining a lease in terms of the "use of tangible personal property"].) Thus, under sections 6011(c)(10) and 6012(c)(10), the tangible form of the manuscript has *no* taxable value to the publisher, and all proceeds from this transfer of the manuscript are exempt from taxation.[8]

Accordingly, Preston's Agreements are technology transfer agreements, and sections 6011(c)(10) and 6012(c)(10) control the tax consequences of these Agreements if these provisions apply retroactively.

### B.

We now turn to the retroactivity issue. Because the legislation adding sections 6011(c)(10) and 6012(c)(10) did not become operative until April 1, 1994—several months after the end of Preston's audit period—these provisions do not govern here unless they apply retroactively. Even assuming that sections 6011(c)(10) and 6012(c)(10) "substantially change[] the legal consequences of past events" (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 [62 Cal.Rptr.2d 243, 933 P.2d 507] (*Western Security*)), we conclude they do.

"Whether a statute should apply retrospectively or only prospectively is, in the first instance, a policy question for the legislative body

---

[7]We also disapprove of *A & M Records, Inc. v. State Bd. of Equalization, supra,* 204 Cal.App.3d at pages 375-376, and *Capitol Records, Inc. v. State Bd. of Equalization, supra,* 58 Cal.App.3d at page 596, to the extent they conflict with sections 6011(c)(10) and 6012(c)(10).

[8]We note that the manuscript example may no longer reflect the realities of the publishing process. With the advent of modern technology, most publishers ask the author for the manuscript on a computer diskette, which is physically used in the editing and production process. Publishers can also scan handwritten or typed manuscripts directly into their computers. Thus, publishers today may receive some value from the tangible form of the manuscript.

enacting the statute." (*Western Security, supra,* 15 Cal.4th at p. 244.) Although statutes "are generally presumed to operate prospectively and not retroactively," this presumption is rebuttable. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371], fn. omitted.) "[W]hen the Legislature clearly intends a statute to operate retrospectively, we are obliged to carry out that intent unless due process considerations prevent us." (*Western Security,* at p. 243.) We may infer such an intent from the express provisions of the statute as well as from extrinsic sources, including the legislative history. (See *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1210 [246 Cal.Rptr. 629, 753 P.2d 585] (*Evangelatos*).)

■ With respect to sections 6011(c)(10) and 6012(c)(10), the pertinent legislative materials reveal an unequivocal legislative intent to give it retrospective effect. In particular, the official statement of intent indicates that the Legislature intended sections 6011(c)(10) and 6012(c)(10) to apply retroactively. Section 3 of the 1993 statute amending sections 6011 and 6012 provides that: "It is the intent of the Legislature in enacting this act to clarify the application of the Sales and Use Tax Law (Part 1 (commencing with Section 6001) of Division 2 of the Revenue and Taxation Code) to technology transfer agreements, as defined." (Stats. 1993, ch. 887, § 3, p. 4831.) This statement alone strongly suggests that the Legislature intended for sections 6011(c)(10) and 6012(c)(10) to "apply to all existing causes of action from the date of its enactment," even if these subdivisions do not, in fact, clarify existing law. (*California Emp. etc. Com. v. Payne* (1947) 31 Cal.2d 210, 214 [187 P.2d 702] (*Payne*); see also *Western Security, supra,* 15 Cal.4th at p. 243.)

The legislative history reinforces our interpretation of this statement of intent. As explained earlier, Assembly Member Quackenbush introduced Assembly Bill No. 103 in order to implement *Intel.* (See *ante,* at pp. 216-217.) Although several analyses warned the Senate about the breadth of Assembly Bill No. 103 and its apparent expansion of *Intel,* the Senate declined to amend the bill. (See *ante,* at pp. 216-217.) Instead, the Senate *added* the statement of intent language found in section 3 of Assembly Bill No. 103 *after* receiving these warnings. (See Sen. Amend. to Assem. Bill No. 103, Aug. 17, 1993.)

At this point, the Board expressed its own reservations about Assembly Bill No. 103's broadening of *Intel* and the newly added statement of intent language. "Proposed Section 3 of the bill would provide legislative intent language which specifies that this act is intended to clarify the application of the Sales and Use Tax Law with respect to technology transfer agreements, as defined in the bill. However . . . the proposed definition of technology

transfer agreements could be interpreted more broadly, and, with this intent language, *could even be extended retroactively.*" (State Bd. of Equalization, analysis of Assem. Bill No. 103, as amended Aug. 17, 1993, p. 4, italics added.) Despite this admonition, the Legislature enacted Assembly Bill No. 103 *without* altering the statement of intent language. (Compare Stats. 1993, ch. 887, § 1, p. 4828 with Sen. Amend. to Assem. Bill No. 103, Aug. 17, 1993.)

Thus, the legislative history makes two things clear. First, the Legislature added a statement giving Assembly Bill No. 103 retrospective effect even though it was aware that the bill may partially change existing law. Second, the Legislature was aware of the retroactivity question during the enactment process and, nevertheless, chose to adopt language giving the statute retrospective effect. Under these circumstances, we conclude that the Legislature intended sections 6011(c)(10) and 6012(c)(10) to apply retroactively. (See *Evangelatos, supra*, 44 Cal.3d at p. 1211 [where the Legislature consciously considers retroactivity and adopts language indicating an intent to give a statute retrospective effect, we may infer such an intent].)

The characterization of the legislation as a "tax levy within the meaning of Article IV of the Constitution" does not alter our conclusion. (Stats. 1993, ch. 887, § 5, p. 4831.) By using this language, the Legislature merely acknowledged the normally accelerated effective date of the legislation in accordance with the dictates of article IV, section 8, subdivision (c) of the California Constitution.

Likewise, the postponement of the operative date of the legislation until "the first day of the first calendar quarter commencing more than 90 days after the effective date of this act" does not mean that the Legislature intended to limit its application to transactions occurring after that date. (Stats. 1993, ch. 887, § 5, p. 4831.) ▌ "The effective date [of a statute] is . . . the date upon which the statute came into being as an existing law." (*People v. McCaskey* (1985) 170 Cal.App.3d 411, 416 [216 Cal.Rptr. 54].) "[T]he operative date is the date upon which the directives of the statute may be actually implemented." (*Ibid.*) Although the effective and operative dates of a statute are often the same, the Legislature may "postpone the operation of certain statutes until a later time." (*People v. Henderson* (1980) 107 Cal.App.3d 475, 488 [166 Cal.Rptr. 20].) The Legislature may do so for reasons other than an intent to give the statute prospective effect. For example, the Legislature may delay the operation of a statute to allow "persons and agencies affected by it to become aware of its existence and to comply with its terms." (*People v. Palomar* (1985) 171 Cal.App.3d 131, 134-135 [214 Cal.Rptr. 785].) In addition, the Legislature may wish "to give

lead time to the governmental authorities to establish machinery for the operation of or implementation of the new law." (*Estate of Rountree* (1983) 141 Cal.App.3d 976, 980, fn. 3 [192 Cal.Rptr. 152].) A later operative date may also "provide time for emergency clean-up amendments and the passage of interrelated legislation." (*Henderson*, at p. 488.) Finally, a later operative date may simply be "a date of convenience . . . for bookkeeping, retirement or other reasons." (*Ross v. Bd. of Retirement of Alameda County Employees' Retirement Assn.* (1949) 92 Cal.App.2d 188, 193 [206 P.2d 903].)

■ In this case, the Legislature gave no rationale for the postponement. Thus, it may have postponed the operative date for reasons *other than* an intent to give sections 6011(c)(10) and 6012(c)(10) prospective effect. For example, the Legislature may have wished to give the Board time to enact new regulations for the 1993 tax year or to settle ongoing tax disputes prior to the implementation of the legislation. The Legislature also may have anticipated possible cleanup amendments in light of the Board's reservations over the scope of sections 6011(c)(10) and 6012(c)(10). (See State Bd. of Equalization, analysis of Assem. Bill No. 103, as amended Aug. 17, 1993, pp. 2-3.) The delayed operative date may also reflect nothing more than a legislative desire to correlate the operative date to the filing deadlines for the 1993 tax year. Indeed, the Legislature's decision to make the legislation adding sections 6011(c)(10) and 6012(c)(10) operative on April 1, 1994—just before the April 15 deadline for filing 1993 tax returns—equally suggests an intent to apply these subdivisions retroactively to transactions occurring in 1993. In any event, where, as here, compelling indicators of the Legislature's intent to give a statute retrospective effect exist, the mere postponement of the statute's operative date is not enough to negate these indicators. (See *Tevis v. City & County of San Francisco* (1954) 43 Cal.2d 190, 194-196 [272 P.2d 757] [a charter amendment has retrospective effect even though the amendment delayed its effective date].)

Of course, even where the ascertainable indicators of legislative intent call for retroactive application (*In re Marriage of Bouquet, supra*, 16 Cal.3d at p. 591), we will not apply a statute retroactively if "there is some constitutional objection thereto." (*Payne, supra*, 31 Cal.2d at p. 214.) However, no such objection exists here. Retroactive application of sections 6011(c)(10) and 6012(c)(10) does not violate due process because it can only reduce the tax liability of a claimant and therefore cannot impair any vested property right of the claimant. (See *In re Marriage of Bouquet*, at pp. 591-594.)

Giving sections 6011(c)(10) and 6012(c)(10) retrospective effect also does not constitute a gift of public funds in violation of article XVI, section 6 of the California Constitution. ■ "As a general rule, the Legislature cannot provide relief for taxes which have become fixed and vested." (*Scott v.*

*State Bd. of Equalization* (1996) 50 Cal.App.4th 1597, 1604 [58 Cal.Rptr.2d 376].) However, "expenditures of public funds or property which involve a benefit to private persons are not gifts within the meaning . . . of the Constitution if those funds are expended for a *public purpose* . . . ." (*Payne, supra,* 31 Cal.2d at p. 216, italics added.) "The determination of what constitutes a public purpose is primarily a matter for the Legislature, and its discretion will not be disturbed by the courts so long as that determination has a reasonable basis." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 746 [97 Cal.Rptr. 385, 488 P.2d 953].) Consistent with this deference to the Legislature, courts have upheld the constitutionality of retroactive tax exemptions that provided relief to "unwary taxpayers" (*Scott, supra,* 50 Cal.App.4th at p. 1605), promoted the use of alternative energy sources (*County of Sonoma v. State Bd. of Equalization* (1987) 195 Cal.App.3d 982, 993 [241 Cal.Rptr. 215]), or prevented "undue hardship on employers" (*Schettler v. County of Santa Clara* (1977) 74 Cal.App.3d 990, 1004 [141 Cal.Rptr. 731]).

 Even assuming the Board had a fixed and vested right in the sales tax assessed against Preston, the retroactive application of sections 6011(c)(10) and 6012(c)(10) falls within this public purpose exception. By enacting these provisions, the Legislature "intended to provide certainty to business taxpayers" and "improve the business climate in California." (Assem. Com. on Rev. & Tax., Analysis of Assem. Bill No. 103, as amended Mar. 17, 1993, p. 2; see also Sen. Com. on Rev. & Tax., Analysis of Assem. Bill No. 103, July 7, 1993, p. 2.) Such an intent is undoubtedly a valid public purpose, and sections 6011(c)(10) and 6012(c)(10)—which clarify and limit the tax burden of businesses—are wholly consistent with this purpose. Therefore, retroactive application of sections 6011(c)(10) and 6012(c)(10) does not create an unconstitutional gift of public funds. (See *County of Sonoma v. State Bd. of Equalization, supra,* 195 Cal.App.3d at p. 993.)

Accordingly, we conclude that sections 6011(c)(10) and 6012(c)(10) have retrospective effect and govern the Agreements at issue here. Under these provisions, only the portion of Preston's income attributable to the Agreements' temporary transfer of tangible artwork is taxable. Because the Agreements do "not separately state a price for the tangible personal property" (§§ 6011(c)(10)(B), (C), 6012(c)(10)(B), (C)), the amount subject to taxation is either "the price at which the tangible personal property was sold, leased, or offered to third parties" (§§ 6011(c)(10)(B), 6012(c)(10)(B)), or "200 percent of the cost of materials and labor used to produce the tangible personal property subject to tax" (§§ 6011(c)(10)(C), 6012(c)(10)(C)). We therefore remand for a calculation of the sales tax owed by Preston under the Agreements and the resulting refund owed to her.

DISPOSITION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

George, C. J., Baxter, J., and Chin, J., concurred.

**KENNARD, J.,** Dissenting.—California imposes a tax on the sale of tangible personal property but not on the sale of intangible personal property. Here, plaintiff Heather Preston temporarily transferred her original artwork to a publisher for reproduction in children's books. Is such a transfer a sale of intangible property and thus not taxable, or is it a sale of tangible property and therefore taxable? The majority holds the latter. (Maj. opn., *ante,* at pp. 208-212.) The majority also concludes that the technology transfer agreement tax statutes (Rev. & Tax. Code, §§ 6011, subd. (c)(10), 6012, subd. (c)(10))[1] are retroactive and that plaintiff's transfer of her artwork is taxable under those statutes. (Maj. opn., *ante,* at pp. 213-215, 221-225.)

I disagree on both points.

I

Unlike the majority, I agree with plaintiff that the transfer of her original artwork to a publisher for reproduction in children's books was a transfer of intangible property and therefore not taxable. As plaintiff points out, this transfer, for tax purposes, is indistinguishable from an author's transfer of an original manuscript to a publisher. A Board of Equalization regulation expressly recognizes the latter transaction as a transfer of intangible property and thus not taxable. (Cal. Code Regs., tit. 18, § 1501 (regulation 1501).)

Regulation 1501 provides in relevant part: "[A]n idea may be expressed in the form of tangible personal property and that property may be transferred for a consideration from one person to another; however, the person transferring the property may still be regarded as the consumer of the property. *Thus, the transfer to a publisher of an original manuscript by the author thereof for the purpose of publication is not subject to taxation. The author is the consumer of the paper on which he has recorded the text of his creation.* However, the tax would apply to the sale of mere copies of an author's works or the sale of manuscripts written by other authors where the manuscript itself is of particular value as an item of tangible personal property and the purchaser's primary interest is in the physical property. Tax would also apply to the sale of artistic expressions in the form of paintings and

---

[1] All further statutory references are to the Revenue and Taxation Code.

sculptures even though the work of art may express an original idea since the purchaser desires the tangible object itself; that is, since the true object of the contract is the work of art in its physical form." (Italics added.) The majority too recognizes that, under this example, the author of the manuscript is exempt from taxation. (Maj. opn., *ante,* at p. 211.)

Like the author in regulation 1501's example, plaintiff artist expressed on paper her creative efforts, which she transferred to a publisher for reproduction in children's books. The paper was merely the medium of transfer. Just as the "author is the consumer of the paper on which he has recorded the text of his creation" (reg. 1501), plaintiff artist is the consumer of the paper (tangible property) on which she has recorded her artistic expression (intangible property).

The distinction between an author's creative expression in the form of words and, as here, an artist's creative expression in the form of illustrations for a book should make no difference for purposes of taxation. In both, the creative expression represents intangible property. In both, the vehicle for the artist's expression is the paper, which is tangible property. I therefore agree with plaintiff that the transfer of her artistic renderings to a publisher for reproduction in children's books should, for tax purposes, be treated the same as the transfer of an author's manuscript to a publisher.

The majority's holding to the contrary would lead to anomalous results. Consistent with the manuscript example mentioned in regulation 1501, an author's transfer of a manuscript to a publisher would be exempt from taxation. Yet an artist's transfer of original drawings to the publisher for reproduction as illustrations in the same book would be taxable. Because the transfer of property determined to be tangible even though valued in part for its intangible content is taxed on the full value of the transaction (*Simplicity Pattern Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 900, 912 [167 Cal.Rptr. 366, 615 P.2d 555]), an author of a manuscript who also happened to draw the illustrations for the book would, under the majority's holding, have to pay taxes on both the transfer of the manuscript and the artwork if the transfer to the publisher occurred at the same time; but if the illustrations were transferred at a different time, only the transfer to the publisher of the illustrations for the book would be taxable.

According to the majority, plaintiff's original artwork is distinguishable from an author's original manuscript because artwork, unlike a manuscript, is physically useful in the manufacturing process and essential to the ultimate production of books, whereas a manuscript furnishes only "verbal guidance." The majority, however, provides no support for this broad assertion. The majority also asserts that plaintiff's transfer agreements with the

publisher would be "essentially 'worthless' " without the "physical artwork." (Maj. opn., *ante*, at p. 211.) But so would an author's agreement with the publisher to transfer a manuscript without ever providing the manuscript.

To summarize, I see no meaningful difference between an author's transfer of a manuscript to a publisher (nontaxable under the majority's holding) and an artist's transfer of drawings to a publisher for a book's illustrations (taxable under the majority's holding). If the author is not subject to taxation, then neither should the artist here be.

## II

Even if I were to agree with the majority that the transfer here is distinguishable from a manuscript under regulation 1501, that artwork is "technology," and that the transfer is governed by the technology transfer agreement statutes (maj. opn., *ante*, at p. 225), I would conclude, contrary to the majority, that these statutes are not retroactive.

At issue are plaintiff's transfers of illustrations to the publisher for the period January 1, 1990, to December 31, 1993. Thereafter, the Legislature enacted the technology transfer agreement statutes at issue and directed that they become operative on April 1, 1994. (Stats. 1993, ch. 887, § 5, p. 4831.)

A statute is presumed to operate prospectively unless there is "an express declaration of retrospectivity or a clear indication" that the Legislature intended otherwise. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287 [279 Cal.Rptr. 592, 807 P.2d 434]; *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 153 [233 Cal.Rptr. 308, 729 P.2d 743].) Here we have neither.

The majority insists, however, there is a clear indication of the statutes' retroactivity. In enacting the statutes, the Legislature expressed its intent to "clarify the application of the Sales and Use Tax Law . . . to technology transfer agreements, as defined." (Stats. 1993, ch. 887, § 3, p. 4831.) I do not share the majority's view that because the Legislature used the word "clarify" when it enacted the technology transfer statutes, it must have intended their retroactive application. Nor does the statutes' legislative history support such an intent by the Legislature.

From the Legislature's decision to postpone the operative date of the statutes to April 1, 1994, 90 days after their effective date (Stats. 1993, ch. 887, § 5, p. 4831), one can reasonably infer, as I do, that the Legislature intended the technology transfer statutes to apply prospectively. As the

majority notes, a statute's operative date may be postponed to give people time to comply with the statute, to allow government agencies to formulate implementing procedures, or to allow for the passage of related legislation. (Maj. opn., *ante,* at pp. 223-224.) This enables individuals and entities to adjust to future applications of new law.

Here, the statutes in question established new law. The Legislature enacted those statutes in the wake of the Board of Equalization decision in *Petition of Intel Corporation* (June 4, 1992) [1993-1995 Transfer Binder] Cal.Tax Rptr. (CCH) paragraph 402-675, page 27,873. (Maj. opn., *ante,* at pp. 216, 222.) The Legislature, however, broadened the types of agreements qualifying for a tax exemption beyond those recognized in *Intel.* (Maj. opn.; *ante,* at pp. 216-218.) Given this change in the law, the Legislature's postponement of the statutes' operative date to a date 90 days after the statutes' effective date tends to support an intent to have the statutes apply prospectively rather than, as the majority concludes, retroactively.

Because there is no clear indication that the Legislature intended to give retroactive effect to the technology transfer agreement statutes enacted after the tax period at issue, I conclude that those statutes are inapplicable here.

CONCLUSION

For the reasons stated above, I would reverse the judgment of the Court of Appeal.

Mosk, J., and Werdegar, J., concurred.